## THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  | : |  |
|---|---|---|
| **In re Volkswagen and Audi** | : | **MDL Docket No. 1:07-md-01790** |
| **Warranty Extension Litigation** | : |  |
|  | : |  |
| _____ | : |  |
|  | : |  |
| **This Document Relates to All Cases** | : |  |
| _____ | : |  |

### PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i

INTRODUCTION ............................................................................................... 1

LEGAL ARGUMENT .......................................................................................... 2

I.      THIS FEE APPLICATION IS PROPERLY DECIDED PURSUANT TO THIS
        COURT'S AUTHORITY OVER SETTLEMENT AGREEMENTS CONFERRED
        BY RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE ....................... 2

II.     THE PERCENTAGE OF RECOVERY METHOD SHOULD BE USED TO
        CALCULATE THE ATTORNEYS' FEES BASED ON THE VALUE OF AT
        LEAST $414 MILLION FOR THE SETTLEMENT CLASS ................................. 6

        A. The Value of the Settlement Is at Least $414 Million .................................. 6

            1. Required Warranty Reimbursement Payments ....................................... 7

            2. Ten-Year Warranty Extension ......................................................... 8

            3. Reduction of Owner Future Repair Costs ............................................ 8

            4. Oil Change Discount .................................................................... 9

            5. Class Member Services: Claims Administration .................................... 9

            6. Class Member Services: Professional Costs ......................................... 9

        B. Since Class Claims Are Paid Directly by Cash and Attorneys' Fees Are A Separate
            Component (and Do Not Reduce Claim Value or Payment Amount), This Is a
            "Common Fund Settlement" ............................................................... 10

            1. The Percentage of the Fee Method Is the Best Method for Nationwide Consumer
                Class Action Settlements Such as This, That Create a Common Fund ............ 10

            2. The Court Should Apply the Percentage of the Fund Method in This Case .......... 12

        C. The Court Should Not Use the Lodestar Method to Calculate Fees, or Should Use It
            Only as a Check Against the Percentage-of-the-Fund Method, Because the Lodestar
            Method Is an Inferior Method That Promotes Inefficiency in This Context ............... 13

**III.     AN ATTORNEYS' FEE AWARD OF $37,500,000 IS APPROPRIATE** ...................14

     A. The Size of the Fund Created and the Number of Class Members .............................14

     B. The Skill and Effectiveness of the Attorneys Involved ................................................14

     C. The Complexity and Duration of the Litigation ..........................................................19

     D. The Risk of Non-Payment .........................................................................................20

     E. The Amount of Time Devoted to the Case by Class Counsel .....................................21

          1. Discovery .............................................................................................................21

          2. Settlement Negotiations .......................................................................................30

**IV.     THE REQUESTED ATTORNEYS' FEE AWARD IS REASONABLE UNDER
     THE LODESTAR CROSS-CHECK**...........................................................................32

**V.     THE REQUESTED EXPENSES IN THE AMOUNT OF AT LEAST $1,121,065.74
     SHOULD BE APPROVED** ...........................................................................................33

**CONCLUSION** .............................................................................................................33

## INTRODUCTION

This case involves the proposed settlement of consolidated class action lawsuits involving approximately 479,768 Volkswagen and Audi vehicles.  In these actions, Plaintiffs have alleged that the 1.8 liter turbo engines installed in Settlement Class Vehicles are prone to the formation of oil sludge and coking deposits even when maintained according to the recommended maintenance intervals and oil quality specifications.  The Defendants deny these allegations and deny any defect, wrongdoing or liability.  For the reasons stated below and to be set forth at the Final Fairness Hearing, the parties have reached a comprehensive Settlement Agreement, which fairly and adequately resolves the matters at issue.

The proposed settlement was finalized on September 2, 2010 after more than four years of hard-fought litigation.  The litigation involved the exchange and analysis of hundreds of thousands of pages of documents.  Most of the documents were technical in nature and available only in German.  The litigation involved eighteen depositions across the United States and seven depositions in Germany (Wolfsburg and Ingolstadt) pursuant to the Hague Evidence Convention.  The discovery process was lengthy and arduous, but it did provide both sides the facts and evidence needed to properly evaluate the issues and design a fair and adequate settlement.

The settlement was reached only after fact discovery was completed.  The fact discovery made it clear that both Plaintiffs and Defendants faced very significant risks and uncertainties in going forward with the case.  The factual discovery also made clear the benefits of reaching a comprehensive, nationwide settlement.  The formal settlement process began in February 2008 and finally concluded with a signed Settlement Agreement on September 2, 2010.

1

## LEGAL ARGUMENT

I.    **THIS FEE APPLICATION IS PROPERLY DECIDED PURSUANT TO THIS COURT'S AUTHORITY OVER SETTLEMENT AGREEMENTS CONFERRED BY RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE**

The Court's review of Plaintiffs' fee petition should be principally guided by the Court's equitable powers and its duties under Rule 23 of the Federal Rules of Civil Procedure to ensure fairness of the Settlement Agreement.  Before evaluating the petition, the Court must ascertain the appropriate law to apply to Plaintiffs' fee request. *See Dewey v. Volkswagen of Am.*, 2:07-cv-02249 2010 WL 3018305, at \*26 (D.N.J. July 30, 2010).  The "American Rule" pertaining to attorneys' fees requires each party to pay their own costs absent a statutory provision imposing a fee-shifting requirement. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 245 (1975).  However, in the context of a class action settlement, a federal district court in the First Circuit may award fees from the fund created to benefit the class as part of the court's equitable powers over such settlement agreements. *See United States v. 8.0 Acres of Land*, 197 F.3d 24, 33 (1st Cir. 1999).  The purpose of this equitable award is to prevent absent class members from deriving a benefit – in the form of the settlement – without having to pay for counsel's efforts in the creation of the fund.  Thus, ***where the fee award is sought pursuant to an agreement between the parties in a federal class action settlement, federal law governs the decision.*** *See Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 522 n.5 (1st Cir. 1991) (noting use of court's equity powers in evaluating fee petitions is a matter of federal common law); *see also Dewey*, 2010 WL 3018305, at \*26 (citing *McGee v. Cont'l Tire N. Am., Inc.*, Civ. No. 06-6234, 2009 WL 539893, at \*13 (D.N.J. Mar. 4, 2009)).[1]

---

[1] The District of New Jersey held this to be the case even where the class action was brought pursuant to the New Jersey Consumer Fraud Act that contained a fee-shifting provision. *See Dewey*, 2010 WL 3018305, at \*26 n.62.

Indeed, the First Circuit has noted "[s]ettlement of a case already in progress in the federal courts implicates matters of considerable **federal** concern entirely apart from the substantive merits.  In such situations, the **federal** interest is sufficiently great that the proper rule of decision may well be a uniquely **federal** one." *Mathewson Corp. v. Allied Marine Indus., Inc.*, 827 F.2d 850, 853 n.3 (1st Cir. 1987) (emphasis added).  The *Mathewson* court, in contrast to the present matter, was a suit between individual companies.  Here, Rules 23(e) and (h) of the Federal Rules of Civil Procedure require the Court to evaluate the fairness of the proposed class action Settlement Agreement, and *inter alia*, Plaintiffs' fee petition. *See Weinberger*, 925 F.2d at 522; *In re TJX Cos. Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 399 (D. Mass. 2008).  Thus, the Court must function as a "quasi-fiduciary to safeguard the corpus of the [settlement] fund for the benefit of the plaintiff class." *In re Fidelity/Micron Sec. Litig.*, 167 F.3d 735, 736 (1st Cir. 1999); *see also Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) (recognizing authority of the district court to award fees out of a common fund set up to pay claims).  This duty demonstrates the significant and uniquely federal concern that warrants application of federal common law to the attorney fee petition irrespective of which law governs the underlying merits of the action.[2]

In *Dewey v. Volkswagen of America*, Magistrate Judge Shwartz in the District of New Jersey considered an argument promulgated by Defendant (represented by same counsel) that New Jersey law applied to the attorneys' fee petition because the cause of action arose under New Jersey statute and the parties had agreed that "New Jersey law govern[ed] the settlement agreement." *Dewey*, 2010 WL 3018305, at *27.  Magistrate Judge Shwartz rejected Defendant's arguments as an attempt to beat the settlement agreement into the shape of relief under the New

---

[2] As will be expanded upon, throughout this memorandum, these protective concerns are well-satisfied where, as here, the money paid for fees and for reimbursement of expenses is separate from and in addition to the benefits to class members and does not reduce those benefits or come from them.

Jersey statute – comparable to pounding a square peg into a round hole.[3]   Instead, Magistrate

Judge Shwartz ruled that class action settlement agreements are to be reviewed *sui generis* under

federal common law due to the federal interests outlined in Rule 23 of the Federal Rules of Civil

Procedure.

Undoubtedly, federal class action case law permits attorneys' fee petitions to be

evaluated based on a percentage of the fund ("POF") or lodestar methodology. *See United States*

*v. 8.0 Acres of Land*, 197 F.3d 24, 33 (1st Cir. 1999).   The lodestar method is simply not the

primary approach in circumstances such as these.   Under the lodestar method, each attorney's

reasonable hourly rate is multiplied by the number of hours reasonably expended on the

litigation. *Id.*   The lodestar methodology is usually limited in application to fee-shifting cases to

---

[3]  Magistrate Judge Shwartz noted:

> During the Fairness Hearing, the defendants argued that the plaintiffs are
> "prevailing parties" under the CFA and that the payment of attorneys' fees is
> occurring pursuant to the fee shifting provisions of N.J.S.A. 56:8-19, and not
> based upon the settlement agreement that obligated the defendants to pay the
> plaintiffs' fees and expenses. ***The defendants' argument is without merit***. . . .
> [B]inding appellate caselaw does not view a voluntary payment of fees as a result
> of a class action settlement to be a payment as a result of statutory fee shift.

*Dewey*, 2010 WL 3018305, at *26 n.62.   Magistrate Judge Shwartz then proceeded to analyze
Defendants' argument that the parties agreed that New Jersey law governs the settlement and
concluded the result would not change:

> First, this choice of law provision appears only in the settlement agreement.
> Second, there is nothing in the settlement agreement about attorneys' fees other
> than an agreement that "class counsel fees and expenses shall be paid entirely and
> exclusively by the defendants" within thirty days of the entry of judgment and the
> amount paid "shall not diminish, invade or reduce or be derived or drawn from
> the Reimbursement Fund."

*Id.* at *27.   Therefore, Magistrate Judge Shwartz declined to analyze the attorneys' fees
as a product of a statutory provision notwithstanding the fee-shifting statute underlying
the cause of action.   Moreover, Magistrate Judge Shwartz analyzed the settlement
agreement's specific terms as guided by federal common law; not the statute or state law
that governed other aspects of the settlement agreement.

"reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation." *In re Rite Aid Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005).

The POF method, by comparison, "awards counsel a variable percentage of the amount recovered for the class." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 786 (3d Cir.1995).   The POF fee award is an "equitable award made at the discretion of the district court." *8.0 Acres of Land*, 197 F.3d at 33 (quoting *Kargman v. Sullivan*, 589 F.2d 63, 69 (1st Cir. 1978)).   Under the POF method, the court is not bound to evaluate a fixed list of factors; rather, it has "extremely broad" discretion in determining an appropriate fee. *Mann & Co. PC v. C-Tech Indus., Inc.*, No. 08-11312-RGS, 2010 WL 457572 (D. Mass. Feb. 5, 2010).   The court must shape the counsel fee "based on what it determines is a reasonable percentage of the fund recovered for those benefitted by the litigation." *In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 305 (1st Cir. 1995).[4]

In the First Circuit, either the lodestar or the POF can be used to evaluate fee petitions in complex litigation with the understanding that the ***POF*** method is the "prevailing praxis" in such cases due to the less burdensome nature of its administration. *Thirteen Appeals*, 56 F.3d at 307. Using the POF method enhances judicial efficiency by permitting the judge to focus on "a showing that the fund conferring a benefit on the class resulted from" the lawyers' efforts rather than scrutinizing "the time records of a multitude of attorneys in order to determine the necessity and reasonableness of every hour expended." *Thirteen Appeals*, 56 F.3d at 307 (quoting *Camden*

---

[4] Indeed, as the Court is well aware, even the lodestar method has a variable element, because the Court will emboss upon the lodestar figure any "multiplier" enhancement flowing, as would be the case here, from the difficulty of the litigation, the length of the battle(s), the zeal and cleverness of opposing counsel in its resistance, the recovery and its benefits, and the questions which had to be asked and answered.  All of those factors are present in this matter, as has been discussed elsewhere.

*I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991)).    By contrast, the lodestar method saps judicial resources by encouraging collateral disputes over the reasonableness of rates and hours expended that can convert the fee petition into a second major litigation. *Id.* Moreover, widespread use of lodestar method incentivizes attorneys to behave inefficiently by spending as many hours as possible on each task and provides a disincentive to settle early. *Id.*

Since Plaintiffs' fee petition is before the Court pursuant to a Class Settlement Agreement, federal law applies.  The First Circuit's precedents regarding attorneys' fees in class settlements govern the evaluation of the fee request and the Court should consider the benefits and drawbacks of the POF and lodestar approach given the unique circumstances of this nationwide complex consumer action.

II.    **THE PERCENTAGE OF RECOVERY METHOD SHOULD BE USED TO CALCULATE THE ATTORNEYS' FEES BASED ON THE VALUE OF AT LEAST $414 MILLION FOR THE SETTLEMENT CLASS**

A.    **The Value of the Settlement Is at Least $414 Million**

On November 30, 2010, Plaintiffs' valuation expert, Kirk D. Kleckner, issued a report entitled "Valuation of Class Member Benefits."  Mr. Kleckner determined the value of each component of the settlement as follows:

| BENEFIT VALUATION SUMMARY | |
|---|---|
| **Benefit** | **Value of Benefit** |
| Required Warranty Reimbursement Payments (Reexamination of Denied/Unsubmitted Claims Pursuant to Existing 8-Year/Unlimited Mileage Warranty) | $243,256,071 |
| Ten-Year Warranty Extension | $55,492,564 |
| Reduction of Owner Future Repair Costs (Education/Information Campaign) | $67,538,851 |
| Oil Change Discount | $3,362,263 |

| | |
|---|---|
| Class Member Services: Claims Administration | $6,000,575 |
| Class Member Services: Professional Costs | $39,250,000 |
| **TOTAL** | **$414,900,324** |

See Valuation of Class Member Benefits dated November 30, 2010 by Kirk D. Kleckner at 6, attached as Exhibit 2.

The settlement class consists of all current and former owners and lessees of 1997-2004 Audi A4s and 1998-2004 Volkswagen Passats equipped with the 1.8 liter turbo engine.

## 1.   Required Warranty Reimbursement Payments

Pursuant to the September 2, 2010 Settlement Agreement, Defendants are required to reexamined claims previously denied under the existing 8-year/unlimited mileage warranty and apply much more relaxed reimbursement criteria.  This benefit applies to the entire settlement class (479,768 vehicles; approximately 1,603,031 current and former owners and lessees).  If the class member has proof of the last two oil changes (with a permissible variance of 20% of the time and mileage intervals) prior to the sludge-related failure, he is entitled to 100% reimbursement for engine repair or engine replacement plus reasonable associated expenses.  If the class member has no proof of oil changes, he is entitled to 50% reimbursement for engine repair or engine replacement plus reasonable associated expenses.

Class members who never submitted their sludge claims under the 8-year/unlimited mileage warranty may submit their claims pursuant to this provision.  The same relaxed criteria apply.  Again, if the class member has proof of the last two oil changes (with a permissible variance of 20% of the time and mileage intervals) prior to the sludge-related failure, he is entitled to 100% reimbursement for engine repair or engine replacement plus reasonable associated expenses.  If the class member has no proof of oil changes, he is entitled to 50%

reimbursement for engine repair or engine replacement plus reasonable associated expenses. The total value of this benefit is estimated to be $243,256,071.00.

### 2.    Ten-Year Warranty Extension

Class members who currently own or lease 2001-2004 Volkswagen Passats or 2001-2004 Audi A4s will receive a 10-year/120,000-mile warranty if they switch to 502 00 oil or synthetic oil. Under this provision, class members whose vehicle suffers sludge-related damage in the future will receive 100% parts and labor with proper documentation of required oil changes. This benefit applies to approximately 274,548 vehicles and is valued at $55,492,564.00.

### 3.    Reduction of Owner Future Repair Costs

This benefit estimates the value of the education/information campaign. As part of the Settlement Agreement, all class members who currently own or lease class vehicles (approximately 349,612 vehicles) will receive revised oil maintenance recommendations (Engine Oil Supplement) which provide clear notice of the dangers of using the mineral oil recommended by Defendants in the owner's manuals for the class vehicles. The revised oil maintenance recommendations also explain the benefits of using 502 00 oil or synthetic oil. These class members will also receive an engine sticker that notifies maintenance personnel that only synthetic oil should be used in this engine. This benefit is valued at $67,538,851.00.

A notice insert which warns class members the 1.8 liter turbo engine requires synthetic oil is being mailed along with the customer letter to all class members. Finally, all class members will receive a benefits insert which clearly explains their rights and benefits pursuant to the Settlement Agreement. Mr. Kleckner values this benefit at $67,538,851.00.

### 4.      Oil Change Discount

Class members who currently own or lease 2001-2004 Volkswagen Passats or 2001-2004 Audi A4s will receive a one-time, $25 discount off the price of an oil change at any authorized Audi or Volkswagen dealer using VW specification 502 00 oil or a synthetic oil certified as complying with VW specification 502 00.   These class members (approximately 268,981 vehicles) have up to one year to take advantage of this discount.   Mr. Kleckner values this benefit at $3,362,263.00.

### 5.      Class Member Services: Claims Administration

Rust Consulting is serving as the Oil Sludge Settlement Administrator ("OSSA").  The OSSA will process claims, answer class members' questions, and maintain claims files.  This benefits class members in terms of convenience, saved time, costs, and so forth.  Mr. Kleckner estimates the number of claims the OSSA will process to be 171,445, with an average cost per claim of $35.00 (total of $6,000,575).

### 6.      Class Member Services: Professional Costs

Defendants are playing Class Counsel fees and expenses separate from the settlement benefits.  Class Counsel fees and expenses do not in any way diminish class members' settlement benefits.   Class Counsel is requesting attorneys' fees of $37.5 million, and costs of approximately $1.12 million.

**B.** **Since Class Claims Are Paid Directly by Cash and Attorneys' Fees Are A Separate Component (and Do Not Reduce Claim Value or Payment Amount), This Is a "Common Fund Settlement"**

1.    *The Percentage of the Fee Method Is the Best Method for Nationwide Consumer Class Action Settlements Such as This, That Create a Common Fund*

The Settlement Agreement creates a common fund.  Accordingly, for this among other reasons, the percentage of the fund ("POF") is the appropriate method for assessing attorneys' fees.  Courts have long recognized that when, as in this case, a party maintains a suit that results in the creation of a fund for the benefit of a class, the costs of the litigation, including an award of reasonable attorneys' fees, should be recovered from the fund created by the litigation. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939); *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116 (1885).  This "equitable" or "common fund" doctrine spreads the cost of the litigation, including attorneys' fees, among the fund's beneficiaries.   The rationale for the common fund principle was described by the United States Supreme Court in *Boeing* as follows:

> [T]his Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole . . .

444 U.S. at 478 (citations omitted); *see also In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 305 n.6 (1st Cir. 1995).

Since *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984), when the Supreme Court observed that in common fund cases "a reasonable fee is based on a percentage of the fund bestowed on the class," courts in the First Circuit have followed the trend in favor of awarding attorneys' fees from a common fund on a POF basis. *See Thirteen Appeals*, 56 F.3d at 307; *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 79 (D. Mass. 2005); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F. Supp. 375, 377 (D. Mass. 1997).  In *Thirteen Appeals*, 56 F.3d at 307, perhaps the

10

First Circuit's most definitive pronouncement on the subject, the Court affirmed the District

Court's attorneys' fee award of 31% of a $220 million common fund, holding that "use of the

POF method in common fund cases is the prevailing praxis" based upon the "distinct advantages

that the POF method can bring to bear in such cases."[5]  The *Thirteen Appeals* court stressed that

the percentage method is far less burdensome to administer than the lodestar method in that it

does not "forc[e] the judge to review the time records of a multitude of attorneys in order to

determine the necessity and reasonableness of every hour expended," and in that it "lessens the

possibility of collateral disputes that might transform the fee proceeding into a second major

litigation." *Id.*  The *Thirteen Appeals* court also noted that, unlike the lodestar method, the POF

method does not create "a monetary incentive to spend as many hours as possible" on the case,

or, conversely, a "disincentive to early settlement," thereby more closely aligning plaintiffs'

counsel's interests with the interests of the class. *Id.*  Finally, because the POF method is "result-

oriented rather than process-oriented," the *Thirteen Appeals* court noted that the POF method

"better approximates the workings of the marketplace." *Id.*[6]

---

[5] *Thirteen Appeals* has been regularly relied upon by courts in this Circuit in determining that the POF method is the appropriate manner in which to award counsel fees. *See generally, In re Relafen*, 231 F.R.D. at 77-78 (attorney entitled to reasonable fee from fund as a whole); *In re Lupron Mktg. and Sales Practices Litig.*, 01-CV-10861-RGS, 2005 WL 2006833, at *2, 3 (D. Mass Aug. 17, 2005) (lawyer entitled to reasonable attorney's fees and expenses from fund prior to distribution to class); *In re Fleet/Norstar Sec. Litig.*, 935 F. Supp. 99, 105 (D.R.I.1996) (In complex litigation, POF appears to be most efficient to administer).

[6] In *Bussie v. Allmerica Fin. Corp.*, Civ. 97-40204-NMG, 1999 U.S. Dist. LEXIS 7793, at *5 (D. Mass. May 19, 1999), the court similarly summarized the advantages of the POF method over the lodestar method: "From a public policy standpoint, the POF method of calculating fees 'more appropriately aligns the interests of the class with the interests of class counsel — the larger the value of the settlement, the larger the value of the fee award.  Furthermore, the POF method encourages efficiency and avoids the disincentive to settle cases easily created by the lodestar method.'" (citations omitted). *See also Strougo v. Bassini*, 258 F. Supp. 2d 254, 262 (S.D.N.Y. 2003) ("[T]he percentage method is consistent with and, indeed, is intended to mirror, practice in the private marketplace"); *In re Lloyd's Am. Trust Fund Litig.*, 96 Civ. 1262, 2002 U.S. Dist. LEXIS 22663, at *74 (S.D.N.Y. Nov. 26, 2002) (holding the percentage method is

Courts have also recognized that in addition to providing just compensation, awards of attorneys' fees from a common fund also serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons, and to discourage future misconduct of a similar nature.  Indeed, in a consumer class action, each plaintiff's individual claim is small and the transaction costs of bringing an individual action is prohibitively high. *See Mazola v. May Dep't Stores Co.*, No. 97-cv-10872-NG, 1999 WL 1261312, at *4 (D. Mass. Jan. 27, 1999). "***The only way for such a plaintiff to recover is to become part of a consumer class action and the only way in which to make such actions economically feasible is to award a percentage of the fund.***" *Id.*

   2. *The Court Should Apply the Percentage of the Fund Method in This Case*

   In this nationwide consumer class action, the Settlement Agreement delineates a series of recovery mechanisms for class members all of which can be easily monetized to make up the common fund.  One of the primary components of the Agreement is the requirement that Defendants pay class members ***in cash*** for all or part of their prior repairs that should have been subject to the product warranty.  Additionally, the Agreement includes a $25 coupon for class members' next oil change and the future repair costs under an extended warranty for class members owning certain models of the vehicles in question.  Since all class members will require oil changes in the near future, the rate of acceptance and use of the $25 coupon should be near universal.  The present value of the extended warranty applicable to only some members of the class can be mathematically ascertained as well.  These mechanisms combine to create a quantifiable recovery fund that generates a true value for class members and thus qualifies as a "common fund." *See In re TJX*, 584 F. Supp. 2d at 402 (quoting <u>Boeing Co. v. Van Gemert</u>, 44

---

favored because it "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation").

U.S. 472, 479 (1980) ("permitting application of percentage-of-fund methodology to a 'lump-sum judgment' to which '*each member of a certified class has an undisputed and mathematically ascertainable claim*'")).

The provision for attorneys' fees and costs in this litigation was negotiated as a discrete component of the Settlement Agreement; separate from the common recovery fund but derived from the same source (following the modern trend in common fund settlements).[7]  The attorneys' fees and costs provision was negotiated after the Settlement Agreement benefits for the class were finalized so that the attorneys' fees would not reduce the value of benefits paid to the class.  Subsequently, counsel for Plaintiffs and Defendants agreed that Plaintiffs' counsel would apply for an attorneys' fee not to exceed $37,500,000 to be paid as part of the settlement.  This Settlement Agreement and fee arrangement is compatible with the First Circuit's common fund doctrine.  Therefore, the Court should consider the $37,500,000 fee request as a percentage of the common fund valued at $414,000,000.

**C.**     **The Court Should Not Use the Lodestar Method to Calculate Fees, or Should Use It Only as a Check Against the Percentage-of-the-Fund Method, Because the Lodestar Method Is an Inferior Method That Promotes Inefficiency in This Context**

The lodestar method should not be used to calculate the attorneys' fees in this action because no fee-shifting provision applies in this context and the lodestar method is disfavored for this type of action.[8]  The comprehensive Settlement Agreement creates a common fund for all members of the class to receive cash benefits and coupons and for some members to receive an

---

[7] *See, e.g., In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821 (3d Cir.1995) ("[P]rivate agreements to structure artificially separate fee and settlement arrangements cannot transform what is in economic reality a common fund situation into a statutory fee shifting case.")

[8] Although it would be inappropriate to use the lodestar method to assess the attorneys' fees in this matter, the First Circuit uses the lodestar as a cross-check in evaluating the reasonableness of fees assessed under the POF method.  The lodestar cross-check is discussed, *infra*.

extended warranty.  While the First Circuit permits a district court to use the lodestar method to calculate fees, in the context of a common fund nationwide consumer class action settlement, the POF method is preferred for administrative purposes and to promote judicial efficiency.  *See Thirteen Appeals*, 56 F.3d at 307.

Moreover, in large consumer class actions, the POF method is preferred over the lodestar method because the POF method is the "only way in which to make such actions economically feasible." *May Dep't Stores Co.*, 1999 WL 1261312, at *4.  Where the dictates of a large consumer action require several law firms to collaborate to spread the inherent risks and significant quantity of work to achieve a settlement the POF method is the better measure to compensate counsel. Indeed, where counsel achieves a settlement such as this one for consumers, that result militates toward approving the POF fee request even where the request would make the suit "lucrative" for class counsel.  *See id.*   Since the lodestar method is inappropriate for common fund settlements and, in the context of nationwide consumer class actions, the POF method is preferred to enhance the economic feasibility of the action, this Court should use the POF method in awarding attorneys' fees in this case.

III.   **AN ATTORNEYS' FEE AWARD OF $37,500,000 IS APPROPRIATE**

A.     **The Size of the Fund Created and the Number of Class Members**

The settlement creates a $414,900,324 benefit for the class.  The settlement applies to approximately 1,603,031 current and former owners and lessees.  The amount of the benefit and the size of the class confirm that the requested fees and costs are reasonable and appropriate.

B.     **The Skill and Effectiveness of the Attorneys Involved**

Plaintiffs' request of $37,500,000 in fees is reasonable when compared with other cases of similar size and duration in light of the significant benefits secured for the class (regardless of

14

how they are valued) and the considerable work performed by counsel to obtain those benefits for the class.  Each case warrants individual consideration based on the results obtained, the work required of counsel to achieve the result, and the duration of the litigation.  For purposes of the result obtained, the courts consider the value of the fund created for the benefit of the class.  Courts have frequently recognized that fee awards in common fund cases typically range from 20 to 30 percent; even in exceptionally large funds. *See, e.g., New England Carpenters Health Benefits Fund v. First Databank, Inc.*, 2009 WL 2408560 (D. Mass. 2009) (awarding 20% of the $350 million fund); *In re Relafen*, 231 F.R.D. 52, 81, 84-85 (D. Mass. 2005) (awarding 33% of $67 million); *Lupron Mktg. & Sales Practices Litig.*, 2005 WL 200683, at *23 (D. Mass. 2005) (awarding 25% of $150 million); *Thirteen Appeals*, 56 F.3d at 300 (awarding 31% of $220 million); *Mazola v. May Dep't Stores Co.*, 1999 WL 1261312, at *4 (D. Mass. 1999) (awarding 20% of the common fund and noting "in this circuit, percentage fee awards range from 20% to 35% of the fund"); *Turabo Med. Ctr. v. Beach*, 1997 WL 33810581, at *3 (noting "typical common fund class action fee awards fall between twenty and thirty percent"); *see also In re Tyco Int'l*, 535 F. Supp. 2d 249 (D.N.H. 2007) (awarding 14.5% of a $3.2 billion fee).

In 1993, the Northern District of Georgia approved a fee award of $16 million in the settlement *In re Domestic Air Transp. Antitrust Litig.* that included a hybrid award of cash and travel coupons.  148 F.R.D. 297 (N.D. Ga. 1993).  In the opinion, the court evaluated the value of coupons for purposes of setting the fee award. *See id.* at 331-332.  *Id.* at 351.  In order to reach a value for the fund, the court thoroughly examined the coupon mechanism to estimate a present value for this future benefit.  Importantly, the court found the present value of the coupons to be ascertainable and estimated the value of the common fund at $305 million based on that valuation. *Id.* at 351.

More recently, the Eastern District of Pennsylvania thoroughly analyzed the value of coupons and extended warranties in an engine sludge case in *O'Keefe v. Mercedes-Benz USA*, Nos. 01-CV-2902, 03-CV-1480 (E.D. Pa. Apr. 2, 2003) (Opinion & Order).  The court accepted the parties' agreement that because the acceptance rate of the $35 coupon toward an oil change was transferable between owners of the vehicles and would be utilized at a near-100% rate, the common fund value for that component of the settlement was equal to the face value ($35) multiplied by the number of class members. *See O'Keefe*, at 80.  With regard to the value of the extended warranty component of the settlement, the court was unhappy with the valuation experts used by both plaintiffs' and defendants' counsel in the case. *Id.* at 86 (the court "realize[d] that [none of the experts provided] the true value and that [the value the court selected] is most likely an undervaluation").  Notably, the *O'Keefe* court ruled that class counsel's fees should be assessed using a valuation of the value of the benefits created for the class in cases that provide extended warranties and coupons for class members.  The *O'Keefe* court found that these benefits are sufficiently capable of valuation to qualify for percentage of the fund treatment.

In light of these cases that demonstrate the mathematical and actuarial capability of assigning a value to the benefits conferred to this class, Plaintiffs' fee request of $37,500,000 is reasonable.  Additionally, Plaintiffs' fee request is within the bounds of comparably sized cases. In the attached table, Plaintiffs have assembled a survey of comparably sized cases with varying awards and lodestars.  Plaintiffs' proposed fee falls squarely within the bounds of these cases.

| COMPARABLY SIZED COMMON FUND SETTLEMENTS | | | | | | |
|---|---|---|---|---|---|---|
| **Case** | **Cite** | **Common Fund Value** | **Lodestar** | **Fee Award** | **POF** | **Multiplier** |
| New England Carpenters Health Benefits Fund v. First DataBank, Inc. | 2009 WL 2408560 (D. Mass. 2009) | $350,000,000 | $8,356,100 | $70,000,000 | 20.00% | 8.38 |
| In re Cedent Corp. Litig. | 109 F. Supp. 2d 285 (D.N.J. 2000) | $3,160,000,000 | $8,012,232 | $262,000,000 | 8.29% | 32.70 |
| In re Tyco Int'l | 535 F. Supp. 2d 249 (D.N.H. 2007) | $3,200,000,000 | $172,043,011 | $464,000,000 | 14.50% | 2.70 |
| In re Raytheon | No. 99-12142 (D. Mass. 2004) | $460,000,000 | $13,159,567 | $41,400,000 | 9.00% | 3.15 |
| In re IKON Office Solutions, Inc. Sec. Litig. | 194 F.R.D. 166 (E.D. Pa. 2000) | $111,000,000 | $12,333,333 | $33,300,000 | 30.00% | 2.70 |
| In re Sumitomo Copper Litig. | 74 F. Supp. 2d 393 (S.D.N.Y. 1999) | $116,000,000 | $12,800,000 | $32,000,000 | 27.59% | 2.50 |
| In re Lease Oil Antitrust Litig. | 186 F.R.D. 403 (S.D. Tex. 1999) | $190,000,000 | $19,308,943 | $47,500,000 | 25.00% | 2.46 |
| Walco Investments v. Thenen | 975 F. Supp. 1468 (S.D. Fla. 1997) | $141,000,000 | $11,666,666 | $21,000,000 | 15.00% | 1.80 |
| In re Combustion Inc. | 968 F. Supp. 1116 (W.D. La. 1997) | $127,000,000 | $15,290,969 | $45,720,000 | 36.00% | 2.99 |
| In re Plywood Antitrust Litig. | MDL 159 (E.D. La. 1988) | $171,000,000 | Unavailable | $25,500,000 | 15.00% | Unavailable |

| In re Thirteen Appeals | 56 F.3d 295 (1st Cir. 1995) | $220,000,000 | Unavailable | $68,200,000 | 31.00% | Unavailable |
| Kurzweil v. Philip Morris Co. | 1999 WL 1076105 (S.D.N.Y. 1999) | $123,800,000 | $15,081,300 | $37,100,000 | 30.00% | 2.46 |
| Lupron Mktg. & Sales Practices Litig. | 2005 WL 2006833 (D. Mass. 2005) | $150,000,000 | Unavailable | $37,500,000 | 25.00% | Unavailable |
| In re Relafen Antitrust Litig. | 231 F.R.D. 52 (D. Mass. 2005) | $75,000,000 | $12,376,237 | $25,000,000 | 33.00% | 2.02 |

| CONSUMER AND COUPON CASES | | | | | | |
|---|---|---|---|---|---|---|
| **Case** | **Cite** | **Common Fund Value** | **Lodestar** | **Fee Award** | **POF** | **Multiplier** |
| McGee v. Continental Tire N. Am. | 2:06-cv-06234 (D.N.J. 2009) | $8,000,000 | Unavailable | $2,274,983 | 28.44% | unavailable |
| O'Keefe v. Mercedes-Benz USA, LLC | 01-CV-2902, 03-CV-1480 (E.D. Pa. 2003) | $32,645,220 | $1,650,360 | $4,896,783 | 15.00% | 2.95 |
| In re Domestic Air Transp. Antitrust Litig. | 148 F.R.D. 297 (N.D. Ga. 1993) | $305,000,000 | $7, 866, 298 | $16,012,500 | 5.25% | 2.04 |

Additionally, as identified in the Consumer and Coupon Cases Table, Plaintiffs' counsel have a higher lodestar and achieved a significantly better result than many of the cases. Plaintiffs' fee request is justified because this case required substantially more work, achieved a substantially better result, and, based on counsel's handling of the unique legal and factual circumstances of

this case (covered throughout this fee application), was significantly more complex making the case more analogous to the larger common fund cases in the first table.

### C.       The Complexity and Duration of the Litigation

This action was commenced in early 2006.  Actions were filed in California, Illinois, Pennsylvania, Florida, Colorado, New Jersey (*see* 5/24/06 Joint Motion for Transfer and Consolidation and 8/29/06 Transfer Order centralizing and transferring the cases in the United States District Court for the District of Massachusetts).

The complaints allege that the 1.8 liter turbo engines in the Settlement Class Vehicles are prone to the formation of oil sludge and coking deposits even when maintained according to recommended maintenance intervals and oil quality specifications.  The Plaintiffs allege that the August 2004 (8-year/unlimited mileage) warranty extension was not fairly administered and many sludge claims were wrongfully denied by the Defendants.  The Plaintiffs requested that Defendants pay for costs associated with sludge-related engine repair or replacements.  In addition, Plaintiffs requested that Defendants inform and educate the class concerning the dangers of using the recommended mineral oil and strongly recommend that the class use only synthetic oil in these vehicles.  The relief requested by Plaintiffs has been substantially obtained through the proposed Settlement Agreement.

Prior to filing, Plaintiffs' counsel conducted extensive investigation concerning the problems with the 1.8 liter turbo engine.  Plaintiffs' counsel consulted with experts in mechanical engineering and oil formulation.  Plaintiffs' counsel directly, and with the assistance of experts, obtained extensive documentary evidence that the 1.8 liter turbo engine has an extremely high failure rate as a result of premature breakdown of the engine oil.

After more than four years of hard-fought litigation, the Defendants have agreed to re-examine all previously denied claims and reimburse their customers pursuant to much relaxed documentation requirements.  In addition, the customers are entitled to a 50% reimbursement of repair or replacement expenses even if they have <u>no</u> documentation of vehicle maintenance prior to the engine failure.

In addition, the vehicles most prone to the failure (2001-2004) will be given a 10-year/120,000-mile Enhanced Oil Sludge Warranty Extension if they switch from the recommended mineral oil to synthetic oil.  All class members will also be provided clear and honest advice concerning the need to use synthetic oil in this engine.  This education/information campaign will likely extend the useful life of the vehicles and reduce the number of engine failures.

### D.    The Risk of Non-Payment

There is a significant risk of non-payment in this case.  It could be difficult for Plaintiffs to collect a large judgment from foreign Defendants.  Audi AG and Volkswagen AG are German corporations.  Germany, like other European countries, generally takes a dim view of the American legal system and our procedures.  Germany is not even a Contracting State to the Hague Convention on the Recognition and Enforcement of Foreign Judgments in Civil and Commercial Matters.   Plaintiffs would have to take a judgment rendered in the United States against two German corporations and hope the German courts would enforce the judgment and not insist on re-litigating the issues.

The potential benefits of proceeding forward with litigation (given these risks) were weighed against the benefits of the proposed settlement.  Class Counsel have concluded that not only is the proposed settlement a fair and just resolution of the class claims against the

Defendants, but indeed the settlement is likely to provide the class with far more financial benefits than it could ever hope to achieve from the Defendants even after years of protracted litigation.

### E.      The Amount of Time Devoted to the Case by Class Counsel

#### 1.      Discovery

After litigation was commenced, extensive discovery was obtained directly from Defendants.   The documentary evidence and the testimonial evidence from Defendants' employees confirmed the sludge and coke problems with the engine and the extremely high failure rates.

Discovery also established that the August 2004 warranty extension was being administered in an unfair manner.  Defendants knew that the engine was failing because they recommended the wrong oil (mineral oil) but were not accepting responsibility for their mistake. Defendants conducted an extensive investigation and determined that the engine failed even when the vehicle was maintained according to the recommended maintenance intervals and oil quality specifications.  Nonetheless, Defendants informed their customers that the primary cause for the failures was improper maintenance by the customers.  The August 2004 warranty extension program required the customer to provide complete maintenance records in order to be entitled to reimbursement for sludge-related repairs or engine replacement.  Many customers could not provide complete records even though their vehicle was properly maintained.  This resulted in many valid sludge claims being denied for a lack of maintenance documentation.

#### a.      Review of Hundreds of Thousands of Pages of Internal Documents

Plaintiffs' counsel have reviewed hundreds of thousands of pages of Defendants' internal documents.  Many of the documents (approximately 60%) were in German, so they had to be

translated first.  These documents included: emails between managers and employees responsible for investigating and resolving the sludging and coking problem; engine testing documents; oil testing documents; warranty claims data; documents relating to Defendants' investigation of engine flush for sludge and coke; warranty policies and procedures manuals; reports regarding individual engine failures due to sludge and coke; investigative reports regarding the sludging and coking problem; reports prepared for Defendants' quality assurance department; scientific reports regarding sludging and coking; Lubrizol oil testing reports; emails between Lubrizol employees who were assisting Defendants in resolving the sludging and coking problem; et cetera.

On March 1, 2007, Defendants produced over 5,300 pages of documents (bates numbered VWOA 1-5302) along with their initial disclosures.  On May 1, 2007, Plaintiffs served their **First Requests for Production.**  Defendants produced documents over a two-and-a-half year period as follows:

| DEFENDANTS' DOCUMENT PRODUCTION | |
|---|---|
| **Date** | **Document Range** |
| 3/1/07 | VWOA 1-5302 |
| 7/3/07 | VWOA 5303-26247 |
| 7/9/07 | VWOA 26248-33033 |
| 7/9/07 | VWOA 33034-44325 |
| 9/18/07 | 5,238 pages of oil sludge warranty claims documents with no bates numbers |
| 10/24/07 | VOLAG 1-267 |
| 10/24/07 | AUDAG 1-3017 |
| 11/30/07 | AUDAG 3018-7957 |

| | |
|---|---|
| 11/30/07 | VOLAG 268-2928 |
| 12/21/07 | VWOA 44326-49563 |
| 12/21/07 | Native form documents (hundreds of JPEG photos of engines and parts, dozens of Excel spreadsheets with warranty claims data and vehicle information, etc.) |
| 2/11/08 | VOLAG 2929-6889 |
| 2/11/08 | AUDAG 7958-11874 |
| 2/19/08 | VOLAG 2929-6889 (re-burn of corrupted data disc) |
| 2/27/08 | AUDAG 2996-3008 (re-burn of corrupted data disc) |
| 2/27/08 | VWOA 26052-26086 |
| 2/27/08 | VWOASUPP 1-3 |
| 3/7/08 | VWOA 49564-81450 |
| 3/14/08 | VWOA 49564-53699 (re-burn of corrupted data disc) |
| 3/18/08 | VOLAG 6890-8676 |
| 4/9/08 | OSVW 1-358 (hard copy documents) |
| 4/10/08 | VOLAG 8677-9253 |
| 4/11/08 | AUDAG 11875-24841 |
| 4/11/08 | OSAUDI 1-557 (hard copy documents) |
| 4/14/08 | OSAUDI 558-823  (hard copy documents) |
| 4/16/08 | OSAUDI 824-2093 (hard copy documents) |

Upon receipt, Plaintiffs counsel organized and reviewed these documents.  This included copying the discs to the computer system and electronically organizing and filing the documents. The paper documents were scanned and then organized and electronically filed on the computer system.  The electronic documents were then loaded into a document review and analysis

program (Summation). The documents were then analyzed and summarized in Excel spreadsheets.

From September 2008 through September 2009, Defendants made the following additional document productions:

| DEFENDANTS' DOCUMENT PRODUCTION | |
| --- | --- |
| **Date** | **Document Range** |
| 9/15/08 | AUDAG 12449.1-182251.1 (unredacted documents produced pursuant to Court's 8/14/08 Further Discovery Order [Doc #105]) |
| 9/15/08 | VOLAG 1824.1-9231.1 (unredacted documents produced pursuant to Court's 8/14/08 Further Discovery Order [Doc #105]) |
| 12/3/08 | AUDAG 10525-24806 (unredacted documents produced pursuant to Special Master's 11/25/08 Order Denying Defendants' Motion for Protective Order) |
| 12/3/08 | VOLAG 1810-8925 (unredacted documents produced pursuant to Special Master's 11/25/08 Order Denying Defendants' Motion for Protective Order) |
| 7/20/09 | AUDAG 2015.1-24825.1 (unredacted documents produced pursuant to 7/15/09 letter from Plaintiffs' counsel) |
| 7/20/09 | OSAUDI 5-1938 (unredacted documents produced pursuant to 7/15/09 letter from Plaintiffs' counsel) |
| 7/20/09 | VOLAG 103.1-7972.1 (unredacted documents produced pursuant to 7/15/09 letter from Plaintiffs' counsel) |
| 7/20/09 | OSVW 121-328 (unredacted documents produced pursuant to 7/15/09 letter from Plaintiffs' counsel) |
| 9/21/09 | AUDAG 17304.1-21402.1 (unredacted documents produced pursuant to 9/16/09 letter from Plaintiffs' counsel) |
| 9/21/09 | VOLAG 1849.supp-9051.supp (unredacted documents produced pursuant to 9/16/09 letter from Plaintiffs' counsel) |
| 9/21/09 | VOLAG 1697.1-9165.1 (unredacted documents produced pursuant to 9/16/09 letter from Plaintiffs' counsel) |

These documents were primarily German documents and were provided to Plaintiffs' counsel in conjunction with the depositions of the German witnesses pursuant to the Hague Convention on the Taking of Evidence Abroad (see below).

On **January 1, 2009**, The Lubrizol Corporation produced over 900 pages of documents **(LZA 1-904)** in anticipation of the January 14, 2009 deposition of Doug Barr, Ph.D. (a scientist and Research Manager in the Chemical Synthesis Department of Lubrizol).

Defendants also produced thousands of pages of documents in response to Plaintiffs' December 14, 2009 **Request for Confirmatory Discovery Documents**.

| DEFENDANTS' DOCUMENT PRODUCTION | |
|---|---|
| **Date** | **Document Range** |
| 1/22/10 | VWOA 82002-115289 |
| 1/22/10 | AUDAG 25000-25109 |
| 1/22/10 | VOLAG 9253-9287 |
| 1/25/10 | VWOA 115681-118662 |
| 1/25/10 | AUDAG 25110-25468 |
| 1/25/10 | VOLAG 9288-9345 |
| 2/1/10 | VOLAG 9336-9511 |
| 2/12/10 | VWOA 118663-120963 |
| 8/23/10 | VWOA 120964-131164 |
| 8/30/10 | VWOA 131165 – 131166 |
| 9/10/10 | VWOA 131167 – 151652 |
| 11/23/10 | Unnumbered docs (VW and Audi Motor Vehicle Lease Agreements |
| 11/23/10 | VWOA 151653 – 151654 (Update to VWOA 131167 – 151652 "Paid Claims Spreadsheets") |

| 11/24/10 | VWOA 151655 - 151672 |
|----------|----------------------|

Plaintiffs' counsel has spent thousands of hours reviewing and analyzing Defendants' discovery and confirmatory discovery documents.

### b.      Depositions of Defense Witnesses Taken in the United States

Review of Defendants' internal documents guided Plaintiffs' counsel regarding the defense witnesses whose testimony was crucial.  Sergio Bianchi and Ramon Martinez were Defendants' U.S. employees who were primarily responsible for investigating the sludge and coking problem in the 1.8 liter turbo engine.  Marc Trahan was the Director of Product Management and Quality who signed the August 2004 warranty extension letter on behalf of Audi.  Dave Sutton worked at VCI and dealt with the marketing and sales of sludged lease return vehicles.  Doug Barr is a scientist and Research Manager in the Chemical Synthesis Department of Lubrizol (an additive company enlisted by Defendants to help find a solution to the sludge and coking problem).  All these witnesses played a pivotal role in this case.

| DEPOSITIONS OF DEFENSE WITNESSES TAKEN IN THE UNITED STATES | | |
|---|---|---|
| **Date** | **Witness** | **Location** |
| 4/21/08 | Sergio Bianchi (Part I) | New York |
| 4/22/08 | Sergio Bianchi (Part II) | New York |
| 4/23/08 | Dieter Loersch (Part I) | New York |
| 4/24/08 | Dieter Loersch (Part II) | New York |
| 4/25/08 | Robert Cameron | New York |

| 5/14/08 | Ramon Martinez | New York |
| 8/6/08 | David Sutton | New York |
| 8/7/08 | Marc Trahan | New York |
| 1/14/09 | Douglas Barr | Cleveland, OH |

### c.    Depositions of Defense Witnesses Taken in Germany

On August 8, 2008, Plaintiffs filed a List of Proposed Deponents (Doc #102-2). Plaintiffs identified eighteen key defense witnesses.  The witnesses either investigated the sludging and coking problem in Defendants' 1.8 liter turbo engines or had responsibility for dealing with the sludging and coking problem.  Approximately fourteen of the witnesses worked for the Defendants in Germany (Wolfsburg or Ingolstadt).  Plaintiffs subsequently agreed to narrow the number of German depositions down to seven crucial witnesses: Dr. Sven Oliver-Kossmehl; Dr. Sabine Graf; Michael Jung; Peter Kremer; Harald Kornprobst; Josef Ruhland; and Moritz von Manz.  On October 23, 2008, this Court ordered Plaintiffs to take the seven German witnesses' depositions through the Hague Convention of 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters.  In December of 2008, Plaintiffs' counsel retained Bird & Bird, LLP (a German law firm located in Munich, Germany) to assist with the German depositions pursuant to the Hague Evidence Convention.

Plaintiffs' counsel prepared Requests for International Judicial Assistance: one request for the German Central Authority in Lower Saxony (where Dr. Kossmehl resided), and another request for the Central Authority in Bavaria (where the other six witnesses resided).  The German documents were then translated into English for counsel and for this Court.  All the English documents (including some of Defendants' internal documents, Requests for International Assistance, proposed orders, and affidavits) were translated into German for the

27

German courts.   On May 13, 2009, the Special Master's office forwarded the Requests for International Judicial Assistance and all related documents to the Central Authorities in Germany.

| DEPOSITIONS OF DEFENSE WITNESSES TAKEN IN GERMANY | | |
|---|---|---|
| Date | Witness | Location |
| 8/20/09 | Dr. Sven-Oliver Kossmehl | Wolfsburg, Germany |
| 9/22/09 | Dr. Sabine Graf | Ingolstadt, Germany |
| 9/22/09 | Josef Ruhland | Ingolstadt, Germany |
| 9/23/09 | Michael Jung | Ingolstadt, Germany |
| 9/24/09 | Peter Kremer | Ingolstadt, Germany |
| 9/25/09 | Harald Kornprobst | Ingolstadt, Germany |
| 9/25/09 | Moritz von Manz | Ingolstadt, Germany |

### d.      Depositions of Class Representatives

Plaintiffs' counsel defended the depositions of eleven Class Representatives.   These depositions took place at the office of Defendants' counsel in New York, New York over a fourteen-month period.

| DEPOSITIONS OF CLASS REPRESENTATIVES | | |
|---|---|---|
| Date | Witness | Location |
| 5/15/08 | Scott Ryder (Part I) | New York |
| 6/24/08 | Scott Ryder (Part II) | New York |
| 6/25/08 | Marie Montag (Part I) | New York |

| 6/26/08 | James Craig (Part I) | New York |
|---------|----------------------|----------|
| 6/26/08 | Marie Montag (Part II) | New York |
| 6/27/08 | Laura Cole | New York |
| 7/22/08 | Carrieann Marks (Part I) | New York |
| 7/22/08 | David Marks | New York |
| 7/23/08 | Carrieann Marks (Part II) | New York |
| 8/19/08 | Eric Emanuelson (Part I) | New York |
| 8/20/08 | James Craig (Part II) | New York |
| 8/21/08 | Matt Leonetti (Part I) | New York |
| 8/22/08 | Matt Leonetti (Part II) | New York |
| 8/22/08 | Stacy Leonetti | New York |
| 4/23/09 | Eric Emanuelson (Part II) | New York |
| 4/23/09 | Margaret Moreau (Part I) | New York |
| 4/24/09 | Margaret Moreau (Part II) | New York |
| 7/10/09 | Sandra Kimball-Ryder | New York |

Defending these depositions required hundreds of hours of preparation (reviewing client documents and reviewing Defendants' discovery documents), meetings with class representatives, and travel to and from New York.

In this case, counsel researched the claims against the Defendants, the defect, and the science involved for many, many months prior to filing the complaints in 2006. Counsel reviewed and analyzed (with oil and engineering experts) enormous amounts of technical and scientific literature in order to evaluate the sludge and coking problem in the 1.8 liter turbo engine. Plaintiffs' counsel reviewed and analyzed hundreds of thousands of pages of documents

produced by the Defendants.  Many of these documents were in German and had to be translated. Plaintiffs' counsel took fourteen depositions, including one in Wolfsburg, Germany in August of 2009 and six in Ingolstadt, Germany in September of 2009 (pursuant to the Hague Convention on the Taking of Evidence Abroad).  Plaintiffs' counsel defended the depositions of eleven class representatives.  Plaintiffs' counsel have conducted extensive discovery and analysis which enabled them to fully investigate the pertinent legal and factual issues against the Defendants.

After more than four years of hard-fought litigation, the Defendants have agreed to re-examine all previously denied claims and reimburse their customers pursuant to much relaxed documentation requirements.  In addition, the customers are entitled to a 50% reimbursement of repair or replacement expenses even if they have <u>no</u> documentation of vehicle maintenance prior to the engine failure.

In addition, the vehicles most prone to the failure (2001-2004) will be given a 10-year/120,000-mile Enhanced Oil Sludge Warranty Extension if they switch from the recommended mineral oil to synthetic oil.  All class members will also be provided clear and honest advice concerning the need to use synthetic oil in this engine.  This education/information campaign will likely extend the useful life of the vehicles and reduce the number of engine failures.

## 2. Settlement Negotiations

| HISTORY OF SETTLEMENT NEGOTIATIONS | | |
|---|---|---|
| **Date** | **Activity** | **Location** |
| 2/15/08 | Conference between Class Counsel and Defendants' counsel to discuss settlement and discovery disputes | Newark, New Jersey |
| 4/18/08 | Written settlement offer from Defendants | |
| 6/26/08 | Plaintiffs' response to 4/18/08 settlement offer | |

| 11/16/08 | Attorney conference with **Special Master** to discuss settlement and other matters | Boston, Massachusetts |
|---|---|---|
| 2/11/09 | Attorney conference with **Special Master** to discuss settlement and other matters | Boston, Massachusetts |
| 6/23/09 | Attorney teleconference with **Special Master** to discuss settlement and other matters | |
| 6/26/09 | Attorney teleconference with **Special Master** to discuss settlement and other matters | |
| 10/7/09 | Attorney teleconference with **Special Master** to discuss settlement and other matters | |
| 10/15/09 | Conference between Class Counsel and Defendants' counsel to discuss settlement | Chicago, Illinois |
| 10/22/09 | Conference between Class Counsel and Defendants' counsel to discuss settlement | Chicago, Illinois |
| 10/29/09 | Plaintiffs' settlement proposal | |
| 11/5/09 | Conference between Class Counsel and Defendants' counsel to discuss settlement | Chicago, Illinois |
| 11/12/09 | Plaintiffs' proposed Term Sheet | |
| 11/19/09 | Conference between Class Counsel and Defendants' counsel to discuss settlement | Chicago, Illinois |
| 12/4/09 | Settlement conference with **Special Master** | Boston, Massachusetts |
| 12/14/09 | Defendants' proposed Term Sheet | |
| 3/3/10 | Plaintiffs' proposed Term Sheet | |
| 4/6/10 | Defendants' proposed Term Sheet | |
| 4/16/10 | Plaintiffs' letter response and 4/16/10 Term Sheet | |
| 4/26/10 | Plaintiffs' settlement letter to Defendants | |
| 4/27/10 | Defendants' settlement letter to Plaintiffs | |
| 4/30/10 | Plaintiffs' proposed Term Sheet | |

| 5/7/10 | Defendants' proposed Term Sheet <u>signed</u> by Defendants' counsel | |
| 5/9/10 | Settlement conference with **Special Master** | Boston, Massachusetts |
| 5/10/10 | Settlement conference with **Special Master** | Boston, Massachusetts |
| 5/10/10 | 5/7/10 Term Sheet <u>signed</u> by Class Counsel | |
| 6/7/10 | Plaintiffs' proposed Settlement Agreement | |
| 6/8/10 | Attorney teleconference with **Special Master** to discuss settlement and other matters | |
| 6/25/10 | Defendants' proposed Settlement Agreement | |
| 6/28/10 | Plaintiffs' proposed Settlement Agreement | |
| 6/30/10 | Settlement conference with **Special Master** | Boston, Massachusetts |
| 7/1/10 | Settlement conference with **Special Master** | Boston, Massachusetts |
| 7/6/10 | Plaintiffs' proposed Settlement Agreement | |
| 7/13/10 | Defendants' proposed Settlement Agreement | |
| 7/28/10 | Plaintiffs' proposed Settlement Agreement | |
| 8/5/10 | Defendants' proposed Settlement Agreement | |
| 8/12/10 | Plaintiffs' proposed Settlement Agreement | |
| 8/31/10 | Plaintiffs' proposed Settlement Agreement | |
| 9/2/10 | Settlement Agreement <u>signed</u> by all counsel | |

## IV. THE REQUESTED ATTORNEYS' FEE AWARD IS REASONABLE UNDER THE LODESTAR CROSS-CHECK

Class Counsel spent a total of 23,191 attorney and staff hours in the prosecution of this case (Exhibit 3). The requested fee ($37.5 million) is reasonable and appropriate considering the efforts put forth by Class Counsel.

**V.      THE REQUESTED EXPENSES IN THE AMOUNT OF AT LEAST $1,121,065.74 SHOULD BE APPROVED**

Costs and expenses in this case were reasonable and necessary to achieve the settlement benefits for the class.  The majority of documents in the case were provided in German and needed to be translated into English.  Plaintiffs' counsel was required to travel to Germany to depose crucial witnesses.  Class Counsel have expended $1,008,610.78, and other Plaintiffs' counsel have incurred costs of $112.454.96 (total of $1,121,065.74); a final tabulation of all costs will be submitted prior to the Final Fairness hearing.  The value of the benefits obtained for the class and the amount of work performed by Class Counsel clearly support an award of the requested costs.

<u>**CONCLUSION**</u>

For the reasons set forth above, Plaintiffs respectfully request the Court award $37.5 million in attorneys' fees and costs in an amount not to exceed $1.75 million.


Dated: 12/20/10                              Respectfully submitted,


                                         _/s/ Kirk D. Tresemer_____
                                         Kirk D. Tresemer
                                         IRWIN & BOESEN, P.C.
                                         4100 E. Mississippi Ave., Ste. 1900
                                         Denver, CO  80246
                                         (303) 999-9999
                                         (303) 320-1915 (fax)
                                         Email: ktresemer@coloradolawyers.com

                                         Peter J. McNulty
                                         McNULTY LAW FIRM
                                         827 Moraga Drive
                                         Los Angeles, CA  90049
                                         (310) 471-2707
                                         (310) 472-7014 (fax)
                                         Email: peter@mcnultylaw.com

Russell D. Henkin
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103
(215) 875-3000
(215) 875-4604 (fax)
Email: rhenkin@bm.net

## CERTIFICATE OF SERVICE

I, Roxanne Torrez, hereby certify that this document, filed through the ECF system, will be sent electronically on December 20, 2010 to the registered participants as identified on the Notice of Electronic Filing (NEF) and to the following recipients:

Hon. Allan van Gestel (via email attachment)
JAMS
One Beacon Street, Suite 2300
Boston, MA  02108
(617) 228-0200
(617) 228-0222 (fax)
Email: allanvangestel@aol.com
Email: pgelinas@jamsadr.com

Jeffrey L. Chase
Daniel V. Gsovski
Herzfeld & Rubin, P.C.
125 Broad Street
New York, NY  10004
 (212) 471-8500
 (212) 344-3333 (fax)
jchase@herzfeld-rubin.com
dgsovski@herzfeld-rubin.com

 */s/ Roxanne Torrez*
Roxanne Torrez

35