UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re*<br>VOLKSWAGEN AND AUDI EXTENDED WARRANTY LITIGATION | Master File No. 1:07-md-01790<br><br>CLASS ACTION |
| This document relates to:<br><br>**All Cases** | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT, IN OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEY FEES AND COSTS AND IN SUPPORT OF APPLICATION TO DEFER RULING ON PLAINTIFFS' MOTION FOR ATTORNEY FEES AND COSTS UNTIL AFTER JUNE 27, 2011**

## INTRODUCTION

The fairness and adequacy of the settlement in this case are not in dispute. Plaintiffs' petition for a $37.5 million attorney fee is another matter. Plaintiffs seek to have this Court invoke "equity powers" to rewrite the parties' agreement into a non-existent "common recovery fund" from which counsel can derive exorbitant fees. Counsel compound the legal impropriety of their proposed phantom fund approach by grossly overestimating the value of the settlement benefits, in order to create a supposed $420 million "pot" from which to claim a percentage. The valuation they propose cannot withstand scrutiny.

Defendant's expert, Prof. Janusz Ordover, one of the world's leading economists, has examined the conclusions of plaintiffs' expert Mr. Kleckner, testing them against the same claims and payment data set available to Mr. Kleckner. What emerges is a picture of almost willful failure by plaintiffs' expert to apply sound analysis and objective methodology. When the gross "denial rate" error which pervades Mr. Kleckner's estimates and other errors are corrected, Prof. Ordover finds that "a more reasonable and accurate" estimate of the value of the settlement, based on currently available data, is between $45 and $50 million – approximately $370 million below plaintiffs' estimates.

The key to plaintiffs' expert's inflated valuation of the settlement is his erroneous assumption that, for the entire history of the settlement class vehicles, since they were first sold in 1996 through today, defendants and their dealers have routinely and systematically denied the claims of most owners who would otherwise qualify for repairs or reimbursements, under both the original warranties and the 8 year/unlimited mileage extended warranty covering oil sludge which has been in effect since August 2004.

This single assumption rests on a demonstrably inaccurate reading of two documents produced by defendants and a failure to make use of all relevant available information. In this manner, Mr. Kleckner substantially inflates the value of the major elements of the settlement to create a total "valuation" of $420 million – using plaintiffs' own fee request to make up the last $39.2 million of that amount.

As noted above, Mr. Kleckner overestimates the settlement value by approximately $370 million from its real estimated value. Of this amount, approximately $230 million represents his overestimate of the number and value of reimbursement claims which will be submitted by June 27, 2011 under the settlement. Defendants fully expect that the reimbursement claims data available in late June 2011 will demonstrate that Prof. Ordover's estimates are accurate, and will settle this dispute definitively. In addition, this information will allow vastly more accurate and precise calculations of other settlement benefits to be made, when Mr. Kleckner's exaggerated "denial rates" are discarded in favor of calculations based on actual claims data under this settlement.

Defendants submit that Mr. Kleckner's opinions on value, which are so obviously wrong, should be disregarded. However, should the Court so decide, another option is to defer a ruling on fees until the value of the reimbursement claims is known, demonstrating that Mr. Kleckner's estimates are wrong and allowing the other benefits conferred by this settlement to be more definitively calculated. Courts in this Circuit and throughout the federal court system often defer fee rulings in such circumstances.

However, should the Court decide to address the fee issue now, the present record clearly shows that plaintiffs' proffered settlement valuation cannot be accepted. In

addition, under the lodestar method that must be employed, plaintiffs' counsel's billings and expenses must be substantially reduced due to the across the board overbilling, overstaffing, and other extravagances in the prosecution of this case, as to which the record shows lack of required "billing judgment" and significant fees/expenses that are not recoverable herein.

## SUMMARY

This MDL consists of seven federal actions that were filed in New Jersey, Florida, California, Massachusetts, Pennsylvania, Ohio and Illinois. The original Complaints in these actions alleged, *inter alia*, causes of action based upon state consumer fraud statutes which permit the recovery of reasonable attorneys' fees and expenses. The individual actions each sought recovery of attorneys' fees, and certification of a statewide or nationwide class, under the consumer fraud fee-shifting statutes.

The actions were consolidated as an MDL and transferred to this Court for pretrial proceedings. Following the transfer, plaintiffs filed a consolidated Class Action Complaint. The original consolidated Class Action Complaint asserted claims, and sought the certification of a nationwide class, under the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1 *et seq*. The New Jersey CFA is a fee-shifting statute which allows plaintiffs to recover reasonable attorneys' fees and expenses. N.J.S.A. 56:8-19. Plaintiffs, through their Class Counsel, filed two Amended Class Action Complaints which likewise asserted claims, and sought a nationwide class, under the New Jersey CFA. All of these actions are being resolved by the proposed Settlement in this case.

**Settlement Fairness**

The parties are in agreement as to the fairness and adequacy of the relief provided to the settlement class. This relief has four major components. These are: 1) For all settlement class vehicles, a generous two–tier reimbursement for past documented oil sludge repairs, depending upon oil change documentation, with a 50% reimbursement guaranteed even if no maintenance can be documented and 100% reimbursement if only the last two oil changes before the repair can be established; 2) For 2001-2004 settlement class vehicles, a 10 year/120,000 mile enhanced warranty extension that adds 2 years to the 8 year/unlimited mileage extended oil sludge warranty voluntarily offered by defendants in August 2004, conditioned on the use of VW specification 502 00 oil; 3) For 2001-2004 settlement class vehicles, a one time $25 discount against a VW specification 502 00 oil change at an authorized Audi or VW dealer, good for one year after the settlement becomes final; 4) For all settlement class vehicles, owner's literature and related information concerning oil maintenance, sludge issues, and recommendation to use VW specification 502 00 oil, including website listings of oils meeting this standard and an engine compartment sticker reminding owners of the 502 00 oil recommendation.

Defendants respectfully refer to the Declaration of Jeffrey L. Chase, Esq., Docket 159, submitted on September 13, 2010 concerning their reasons for entering into and supporting the settlement in this case. In the interest of brevity, defendants offer no further direct discussion of fairness of the settlement, but agree with plaintiffs' position on this point. In so doing, defendants of course maintain their position that neither their products nor their actions vis-à-vis customers give rise to any legal liability and that the

actions voluntarily undertaken prior to the commencement of litigation were more than sufficient to address any customer issues calling for action.

**Attorney's Fees and Settlement Valuation**

Though in agreement as to the fairness and adequacy of the settlement, the parties are hundreds of millions of dollars apart in their monetary valuation of the settlement, and diametrically in opposition as to the appropriate method by which to determine attorney fees in this case.

In any event, plaintiffs' overblown value estimates cannot be used to derive their fees, as no aspect of this settlement furnishes an appropriate predicate for the use of a "percentage of the fund" (POF) fee award. The settlement in this action does not create or provide for any monetary fund. No "pool of money" is provided, nor is any settlement class member afforded a sum certain. This precludes any logical treatment of this settlement as a "fund." Moreover, in contrast to true fund settlements, in which the settlement value is fixed and undisputed, the value of the settlement in this case is massively in dispute.

The governing law mandates a lodestar analysis to award fees in this case. However, plaintiffs' claimed $13 million in time and charges must be substantially reduced across the board to compensate for the overbilling, overstaffing, waste, billing for overhead functions, block billing, expense account extravagance and other unbillable elements, as to which the record shows a clear lack of "billing judgment" which should have been removed from the raw records before the petition was submitted. This Court does not have to become a "bean counter" or conduct a line by line audit to appreciate the scope of these elements in plaintiffs' petition and, under firm precedent in this and other

courts, can and should rectify such across the board excessive charges through a comprehensive adjustment.

**ARGUMENT**

**POINT I**

**THIS COURT SHOULD DEFER RESOLVING THE FEE ISSUE UNTIL AFTER JUNE 27, 2011, WHEN VALID REIMBURSEMENT CLAIMS CAN BE COUNTED AND VALUED WITH CERTAINTY**

Under either a "lodestar" or "percentage of benefit" calculation, "[o]ne of the most significant considerations taken into account in setting the ultimate fee is the benefit conferred by the litigation." *In re TJX Companies Retail Security Breach Litigation,* 584 F. Supp.2d 395, 399 (D. Mass. 2008) (Young, J.), quoting 7B Wright, Miller & Kane, *Federal Practice & Procedure* § 1801.1 at 355 (3d. ed. 2005) As detailed in their reports, Plaintiffs' expert, Mr. Kleckner and Defendants' expert, Professor Ordover, calculate radically different estimates of the monetary value of the settlement benefits in this case.

At paragraph 13 of his Report (Chase Declaration, Exhibit 1), Prof. Ordover sets forth Mr. Kleckner's estimates and his own proposed corrections to them, side by side, as follows:

| | Kleckner Estimate | Ordover Estimate Correcting Kleckner |
|---|---|---|
| Required Warranty Reimbursement Payments: | $247,122,692 | $10,944,237 |
| Ten-Year Warranty Extension: | $56,615,996 | $12,012,438 |
| Reduction of Owner Future Repair Costs: | $68,535,301 | $18,719,788 |
| Oil Change Discount: | $3,362,263 | $3,362,263 |
| Class Member Services: Claims Administration: | $6,100,703 | $385,455 |
| **Total Before Professional Costs:** | **$381,736,955** | **$45,424,181** |
| Class Member Services: Professional Costs: | $39,250,000 | $4,669,606 |
| **Grand Total:** | **$420,986,855** | **$50,093,787** |

Depending upon whether one includes plaintiffs' requested attorney in the settlement value, which is not appropriate, the difference between plaintiffs' improper substantially inflated valuation and what we submit is the correct settlement valuation, ranges from $336 million to $370 million. Approximately 65-70% of this differential – roughly $236 million – represents the difference between the parties' estimates for the amount of valid reimbursement claims under Section III. A. of the Settlement Agreement.

On every significant component of the settlement valuation other than the $25 oil change discount, which both experts value at $3,362,263, Mr. Kleckner's estimates, all of which are driven by his inflated "denial rates," are wildly beyond what the facts indicate, as Prof. Ordover demonstrates in his report. As a result, Mr. Kleckner overvalues the 10 year warranty extension by $46 million, the reduction in future repair costs by nearly $60 million, and even the administrative expenses and 10% of the "fund" attorney fees by $5.7 million and nearly $35 million respectively. These and other shortcomings are discussed in greater detail in section IV, below.

Though defendants are confident of the outcome, there is in fact no need for this Court to referee this particular battle of experts. Shortly after June 27, 2011, the deadline for submission of reimbursement claims, the actual number of claims and their payment values will become matters not of prediction but of fact. Moreover, the mathematical structure of the formulas being employed by both plaintiffs' and defendants' experts is such that, once the number and value of reimbursement claims is known, many of the other disputed components of the settlement valuation can be calculated with better precision, using the claims number and value as inputs. Prof. Ordover spells this out in his report as follows:

> 11. Although in my opinion [my] alternative estimates . . . are more reasonable and accurate than Mr. Kleckner's inflated estimates, by late June 2011, there will be information that will allow for a more precise estimation of the value of the Settlement as class members will be submitting their claims for unreimbursed past oil sludge repairs. This will allow one to know precisely within a short period of time after June 27, 2011 the value of class member claims made under the Required Warranty Reimbursement Payments provision during the Settlement claims period. This is the main component of Mr. Kleckner's valuation of this Settlement. Furthermore, the information obtained by June 2011 will permit a more accurate estimate of the other components of the valuation either through improved estimation of the denial rates (using Mr. Kleckner's assumed take up rates) or through direct estimation of the expected future oil sludge claims based on the past claims.

Defendants respectfully submit that Mr. Kleckner's projections are grossly overstated, and Prof. Ordover's more accurate and methodologically sound valuations should prevail. Alternatively, an accurate approach is to defer to actual knowledge of the exact value and number of valid reimbursement claims which will be submitted by the June 27, 2011 deadline. Otherwise, a premature fee and expense award in plaintiffs' requested amount of $39.2 million, premised upon Mr. Kleckner's flawed valuations,

could potentially "put more money in the pockets of the attorneys than in those of the wronged clients in whose name the suit was allegedly brought." *In re TJX Companies Retail Security Breach Litigation*, 584 F. Supp.2d at 402. This would be avoided by waiting a short period of time for the facts.

Awarding fees based on hard data, aside from obviating a massive "battle of the experts," also serves broader policy objectives cogently summarized by this Court, per Judge Young:

> . . . While it may not instantaneously or completely resolve the problems that currently inhere in this type of litigation, ***tying the award of attorneys' fees to claims made by class members is one step that judges can take toward repair*** . . . See Deborah R. Hensler and Thomas D. Rowe, Jr., b*eyond "it just ain't worth it": alternatives strategies for damage class action reform,* 64 LAW & CONTEMP. PROBS. 137, 150 (2001)("'The single most important action that judges can take to support the public goals of class action litigation is to reward class action attorneys only for lawsuits that actually accomplish something of value to class members and society.' To this end, . . . ***analysts recommend[] that judges award fees based on the actual amount paid out by defendants to class members,*** notwithstanding contrary case law." (quoting DEBORAH HENSLER ET AL., *PURSUING PUBLIC GOALS FOR PRIVATE GAIN – EXECUTIVE SUMMARY* 33 (1999)

*In re TJX Companies Retail Security Breach Litigation*, 584 F. Supp. 2d at 406. (emphasis added)

Here, "the actual amount paid out by defendants to class members" on reimbursement claims will be known after June 27, 2011, and will in turn permit every other current estimate of settlement benefits to be calculated based on these facts. Judge Young in *TJX* noted with approval Judge O'Toole's adoption of a procedure essentially similar to that urged herein:

> . . . [I]n *Duhaime v. John Hancock Mutual Life Insurance Company*, 989 F. Supp. 375, 379 (D. Mass. 1997), Judge O'Toole in this District stated that "the proportionality of the fee to the relief actually accruing to the

> class is an . . . important consideration in assessing the reasonableness of the fee award." Thus, the court chose to withhold a portion of the requested fee until after class members submitted their claims, permitting the court to determine whether the actual value created by the litigation approached that estimated by class counsel. Id. at 379-80. The court considered this the best way to ensure "the fee awarded [was] appropriate to the value actually received by the class members." *Id.* at 378.

*Id.*, 584 F. Supp. 2d 395, 403.

Other courts have taken similar steps to avoid unnecessary uncertainty. *See, e.g., Bowling v. Pfizer, Inc.*, 922 F. Supp. 1261, 1283-84 (S.D. Ohio), *aff'd*, 102 F.3d 777 (6th Cir. 1996) (withholding majority of fee award until estimated benefits were actually paid); *Voege v. Ackerman*, 67 F.R.D. 432, 436-37 (S.D.N.Y. 1975) (reserving fee determination until all claims of shareholders entitled to participate in settlement had been determined), and additional cases cited in *Duhaime, supra.*

Because the final tally of reimbursement claims will be known in a relatively short time, there is no reason to proceed in stages. Cf., *Duhaime v. John Hancock Mutual Life Insurance Company*, 989 F. Supp. 375, 380 (D. Mass. 1997) (deferring final fee payment by at least one year pending claims submission). This Court, we submit, should simply "count the votes after the polls close" and then proceed to address the fee and valuation issues on a solid factual footing.

As recent developments have made clear, the fee issue in this case will have to proceed in two broad phases – an initial aggregate award to all plaintiffs' counsel, followed by what promises to be a protracted and spirited struggle among plaintiffs' counsel over their respective shares. We respectfully submit that a brief delay is a modest price to pay to avoid "a second major litigation" on the peripheral issue of attorneys' fees.

The parties agree that the settlement is fair and adequate, and can present this issue fully to the Court independent of the attorney fee issue. Since the fees will not affect or diminish a single settlement class member's recovery, the fairness of the settlement cannot be affected by the fee award. In fact, the Settlement Agreement and Preliminary Approval Order adopting it explicitly provide that the fairness determination and the fee award may be embodied in separate judgments, permitting separate appeals. A fairness determination can be made based on the March 11, 2011 hearing, subject to the Special Master's recommendation.

## POINT II

## THIS IS NOT A "COMMON FUND" SETTLEMENT FROM WHICH ATTORNEYS' FEES CAN BE AWARDED ON A "PERCENTAGE OF FUND" BASIS

Plaintiffs' counsel attempt to manufacture a "common fund" based upon purported concepts of "federal common law." This approach ignores Fed. R. Civ. P. 23(h) and the state fee-shifting statutes upon which the underlying actions are based.

Fed. R. Civ. P. 23(h) governs the right of counsel in a class action to apply to the Court for reasonable attorneys' fees and expenses. While the "American Rule" provides that parties to a litigation ordinarily bear their own litigation costs, *Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 247 (1975), Rule 23(h) provides two exceptions: "[I]n a certified class action, "the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement" (emphasis added).

An award of reasonable attorneys' fees/expenses is "authorized by law," under the exception of Rule 23(h), when it is authorized under a fee-shifting statute applicable to the action. *In re Thirteen Appeals*, 56 F.3d 295, 305 (1st Cir. 1995).

In the First Circuit and elsewhere, the lodestar[1] method is used in cases, such as this, involving a fee-shifting statute. *In re Thirteen Appeals*, 56 F.3d at 304 ("When statutory [fee-shifting] exceptions pertain, we have directed district courts, for the most part, to compute fees by using the time-and-rate lodestar method"). *See also City of Burlington v. Dague*, 505 U.S. 557 (1992) (In cases involving a fee-shifting statute, there is "a strong presumption that the lodestar represents the reasonable fee"); *De Jesus Nazario v. Rodriguez*, 554 F.3d 196, 207 (1st Cir. 2009) ("[I]n calculating a reasonable amount of fees, courts generally use what is known as the lodestar method" multiplying the number of hours productively spent by a reasonable hourly rate"); *United States v. One Rolex 18k Gold Watch*, 696 F. Supp. 2d 143 (D. P.R. 2010) ("When dealing with a fee-shifting statute, courts typically ascertain reasonable attorneys' fees by means of the lodestar method").[2]

[1] Lodestar is a time-and-rate-based method. "A Court arrives at the lodestar by determining the number of hours productively spent on the litigation and multiplying those hours by reasonable hourly rates." *In re Thirteen Appeals*, 56 F.3d at 305, *citing Blum v. Stenson*, 465 U.S. 886, 896-902 (1984); *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).

[2] *See also United States v. One Star Class Sloop Sailboat*, 546 F.3d 26 (1st Cir. 2008) (fee-shifting case where court applied lodestar); *Bogan v. City of Boston*, 489 F.3d 417 (1st Cir. 2007) (civil rights fee-shifting case where lodestar was used); *Burke v. McDonald*, 572 F.3d 51 (1st Cir. 2009) (lodestar method applied in civil rights lawsuit under 42 U.S.C. §1983); *Frazier v. Commissioner, Maine Dep't of Health & Human Servs.*, 1994 U.S. App. LEXIS 7231 (1st Cir. 1994) (lodestar applied in class action pursuant to fee-shifting statute, 42 U.S.C. §1988).

### A. **These Actions Arise Under, and Are Governed By, Fee Shifting Statutes that Permit Recovery of Reasonable Attorneys' Fees**

Each of plaintiffs' actions and the consolidated action are based upon a consumer protection fee-shifting statute. Many of the individual underlying Complaints plead the New Jersey CFA, N.J.S.A. 56:8-1 et. seq., and its provision for attorney fees.[3] The remaining underlying individual Complaints plead consumer protection fee-shifting statutes of the respective states in which they were filed.[4] The master consolidated Class Action Complaint, filed on behalf of all plaintiffs and putative class members, asserted claims, sought nationwide class relief, and requested attorneys' fees, under the New Jersey CFA fee-shifting statute. The Amended Class Action Complaints continued to specifically plead the New Jersey CFA as the predicate for all plaintiffs' claims for relief, nationwide class treatment and attorneys' fees.[5]

Contrary to plaintiffs' argument at pp. 3-4 of their Brief, *Dewey v. Volkswagen of America, Inc.*, 2010 U.S. Dist. LEXIS 79304 (D. N.J. July 30, 2010) is not controlling in this case. We respectfully submit that Magistrate Judge Shwartz's determination that

---

[3] See the Complaints in *Craig v Volkswagen of America Inc., et al* and *Cohen v Volkswagen of America, Inc., et al.*

[4] Carter v Volkswagen of America, Inc., (claim for relief pursuant to California Business & Professions Code § 17200, et. seq.); Yarkony v Volkswagen of America, Inc., N.D. Ill. (claim for relief pursuant to Illinois Consumer Fraud Act, 815 ILCS 505/2 et seq.); Shero v Volkswagen of America, Inc. et. al, (claim for relief pursuant to the Ohio Consumer Sales Practices Act ("CSPA"), R.C. 1345.02-1345.09); Diveroli et al v. Volkswagenwerk Aktien-Gesellschaft et al, (claim for relief pursuant to Unfair and Deceptive Trade Act Practices M.G.L. c. 93A); Kasten v. Volkswagen of America, Inc., (claim of relief pursuant to Illinois Consumer Protection Act, 815 ILCS 505/2 et seq.); Becker v. Volkswagen of America, Inc., (claim for relief pursuant to Florida Deceptive and Unfair Trade Practice Act ("FDUTPA"), Fla. Stat. § 501.204 , et. Seq).

[5] See, e.g., Master Second Amended Class Action Complaint at ¶1 ("This action seeks damages and injunctive relief for Defendants' violation of the New Jersey Consumer Fraud Act (N.J.S.A. § 56.8-1, et. Seq").

plaintiffs were not "prevailing parties" for purposes of applicable fee-shifting statutes is clearly contrary to First Circuit precedent.[6]

In this Circuit, plaintiffs are entitled to seek attorneys' fees as "prevailing parties" within the meaning of the applicable fee-shift statutes because the settlement must be judicially approved, will result in a judgment and will effectuate a change in the legal relationship of the parties. *See Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 605 (2001); *Hensley v Eckerhart*, 461 U.S. 424, 433 (1983); *Diffenderfer v Gomez-Colon*, 587 F.3d 445 (1st Cir. 2009); *Aronov v Napolitano*, 562 F.3d 84, 88-89 (1st Cir. 2009); *Nelson v. Hecker*, 2010 U.S. Dist. Lexis 50621 (D. Mass., Apr. 28, 2010) (Tauro, J.).

Accordingly, since this action is based upon a fee-shifting statute, the lodestar method governs the determination of plaintiffs' counsels' request for attorney fees.

**B. The Settlement Agreement Authorizes an Award of Attorneys' Fees and Expenses, Not to "Be Derived From" the Settlement Benefits. <u>This Precludes the POF Approach Requested By Plaintiffs' Counsel</u>**

In their fee application, plaintiffs' counsel state:

> The provision for attorneys' fees and costs in this litigation was negotiated as a discrete component of the Settlement Agreement; separate from the common recovery fund but derived from the same source... (Plaintiffs' Brief in Support of Motion for Attorney Fee and Costs [Fee Brief], p. 13).

This distortion of the Settlement Agreement which attempts to masquerade the settlement as a "common fund."[7] As discussed *supra*, the settlement did not create a

[6] Defendants are appealing this aspect of Magistrate Judge Shwartz' decision as contrary to Third Circuit precedent as well. *See, e.g. Truesdell v. Phila. Hous. Auth.* 290 F.3d 159 164 (3d Cir. 2002); *Holmes v. Millcreek Twp. Sch. Dist.*, 205 F.3d 583, 593 (3d. Cir. 2000).

[7] Also incorrect is counsels' statement, on page 13 of their Brief, that defendants agreed that plaintiffs' counsel will apply for an attorneys' fee not to exceed $37,500,000 to be paid as part of the settlement.

"common recovery fund." Nor does the Settlement Agreement permit attorneys' fees and costs to be "separate from the common fund recovery but derived from the same source" (emphasis added). The Settlement Agreement says just the opposite. It specifically states that "class counsel fees and expenses...shall not diminish, invade, or reduce, **or be derived from**, benefits afforded to settlement class members..." Settlement Agreement, Sect. VI. C. 2. (emphasis added).

The Settlement Agreement merely authorizes plaintiffs' counsel to apply to the Court for reasonable attorney fees/expenses and in no way waives counsels' right to statutorily allowable fees under the applicable fee-shifting statutes.[8] Accordingly, the express terms of the non-fund Settlement Agreement preclude the use of the POF approach, because they do not restrict counsels' right to apply for a fee award under the applicable fee-shifting statute(s) upon which plaintiffs' claims are based. Plaintiffs' request for use of a POF approach fails, because the existence of a legal predicate for counsel fees obviates any need for the Court to employ equitable principles to create such a predicate.

---

There was never any agreement as to the amount of the fee for which plaintiffs' counsel can apply, nor was there an agreement than an attorney fee would become "part of the settlement." The only agreement was that plaintiffs' counsel can apply for an attorneys' fee which cannot "be derived from" the settlement benefits. See Settlement Agreement, Sect. VI. C.

[8] The Settlement Agreement states, at Section VI. C. 1.:

> Class Counsel will submit an application to the Court for an award of reasonable Attorneys' fees and expenses on or before a date to be set by the Court ("Fee Application'). Each Settling Party reserves all rights to appeal from a Class Counsel fees and expenses award if that party files a timely and proper objection with the Court. The Class Counsel fees and expenses award and Final Judicial Approval shall be separate so that the appeal of one shall not constitute an Appeal from the other.

In addition, Section VI. A. 2. of the Settlement Agreement provides that there is no "...waiver of state or federal law" to be applied to any aspect of the settlement "including But not limited to attorney fees and costs."

In *Green v. City of New York,* 2009 U.S. Dist. LEXIS 86043 (E.D.N.Y. 2009), a class action involving a fee-shifting statute, the defendant agreed to pay an attorneys' fee awarded by the Court, but did not agree to the amount of such a fee. The Court concluded that defendants' agreement to pay an attorneys' fee did not transform the settlement into a "common fund" or justify the use of a POF approach. The Court held:

> In this case… there is nothing to preclude the operation of the fee shifting statutes and no apparent reason to grant equitable relief. The federal statutes under which this action was brought… both contain fee shifting provisions, permitting a court to award reasonable attorneys' fees to a 'prevailing party.'" … The Settlement did not release defendants from liability for these statutory attorneys' fees … To the contrary, the Settlement specifically provided that plaintiffs' counsel could file and serve on defendants' counsel an application 'for payment by *Defendants* of attorneys' fees and expenses for this action." … Since the Settlement envisions that the defendants, not the lead plaintiffs, will fully compensate class counsel, the class plaintiffs will not be unjustly enriched if class counsel is not awarded a portion of their refunds." (emphasis supplied.)

*Id.* at *22-23.

Here, as in *Green*, the Settlement Agreement provides that plaintiffs' counsel may apply to the Court for a fee and does not extinguish their rights to seek attorneys' fees under the applicable fee-shifting statute.

### C. There is No Reason for the Court to Apply Equity Powers to Create a "Common Fund" Basis for a Fee

In the absence of a statutory or contractual fee-shift, the "common fund doctrine" allows a Court to exercise equity jurisdiction over any fund generated by the litigation to prevent inequity and assess fees against the entire fund, thus spreading fees proportionally among those benefited by the suit. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980), *citing Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 392 (1970). The

"common fund" doctrine reflects "the traditional practice in courts of equity" *Boeing, supra* with the equitable rationale to "prevent unjust enrichment of those benefiting from a lawsuit without contributing to its cost." *Goldberger v. Integrated Resources, Inc.* 209 F.3d 43, 47 (2d Cir. 2000).

"The 'common fund doctrine is designed to spread the costs of litigation among all the beneficiaries <u>of an identifiable fund over which a Court can exercise legitimate control</u>...'" *In Re Lupron Marketing & Sales Practices Litigation*, 2005 US Dis. Lexis 17456, *9 (D. Mass. 2005) (emphasis added) (quoting *Bebchick v. Washington Metro. Area Transit Comm'n*, 805 F.2d 396, 402 (D. C. Cir. 1986)). Clearly, the equity principle is not applicable to the present case because: (1) there is no common fund in control of the court from which plaintiffs' counsel seek reasonable fee allocation; (2) the Settlement Agreement precludes counsel from deriving their fee from the settlement benefits; (3) there is no threat that plaintiffs will be unjustly enriched (a "free ride" without the attorney being paid for his or her labors); (4) plaintiffs' counsels' right to seek statutory attorneys' fees is not affected or waived under the Settlement Agreement's terms, and (5) the attorneys' fee are paid for by the defendants, thereby obviating any need to create an equitable fund from which such fees can be awarded. The policy considerations for the exercise of the Court's equitable powers do not exist in this case.

**D. The Authorities Relied Upon By Plaintiffs' Counsel Do Not Support the POF Method Here.**

The cases upon which plaintiffs' counsel rely do not support the use of a POF method in this action. Those cases involve vastly different circumstances including (a) the absence of a fee-shifting statute that would authorize attorneys' fees, (b) settlements providing a true finite monetary fund from which the individual class members may

directly recover, and/or (c) a "clear sailing" attorneys' fee agreement between the parties where the value of any settlement and the amount of fees requested are not disputed. None of these factors are involved here.

For example, *In Re Thirteen Appeals*, 56 F.3d 295 (1st Cir. 1995) involved a settlement that specifically created a true and finite $220 million cash fund for class members and a cash sub-fund out of which the attorneys' fees were to be allocated. *See also In Re Nineteen Appeals,* 982 F.2d 603 (1st Cir. 1992) (where the Court, in an earlier appeal in the same action, also noted that, under the unique circumstances of the case, it would be unfair to use of lodestar approach because the district court had previously advised counsel that it would be using the POF method, and plaintiffs' attorneys did not maintain time records in reliance thereon).

Likewise inapplicable is *In Re Lupron Mktg. and Sales Practice Litigation*, 228 F.R.D. 75 (D. Mass. 2005), which involved a true, specifically created monetary settlement fund of $150 million, placed in an escrow account from which attorneys' fees were to be awarded. In addition, the parties had stipulated to a POF approach in the Settlement Agreement which stated that "class counsel are permitted to seek reasonable attorneys' fees 'not to exceed 30 percent of the settlement fund'." *Id.* at 78.

*In Re Lloyd's Trust Fund Litig.,* 2002 U.S. Dist. LEXIS 22663 (S.D.N.Y. 2002) also involved a settlement which created a finite monetary fund of $8.5 million and $11.5 million in credit notes to be actually distributed to the class, and from which the court awarded a percentage for attorneys' fees.

*United States v. 8.0 Acres of Land*, 197 F.3d 24 (1st Cir. 1999) is inapplicable for the same reasons. The case involved a monetary fund for the condemnation price of a

parcel of land taken for use by the United States for a national seashore, out of which eligible plaintiffs could obtain a monetary portion. Since a true monetary fund had been created, the Court utilized a POF approach for attorneys' fees but was still careful to check such percentage against the lodestar.

Plaintiffs' counsel argue that despite the express terms of the settlement, a "common fund" approach has been used in the absence of a specifically created monetary settlement fund. However, those cases involved primarily "clear sailing" agreements between the parties, where the value of the settlement and/or amount of attorneys' fees were not in dispute. *See, e.g., In re General Motors Pick Up Truck Fuel Tank Products*, 55 F.3d 768, 822 (3d Cir. 1995); *In re TJX Retail Security Breach*, 584 F. Supp.2d 395 (D. Mass. 2008). The absence of such disputes permitted the Courts to easily compare counsels' uncontested fee requests to the value of the settlements. Here, the parties are vigorously disputing both the value of settlement and counsels' fee request.

Plaintiffs are also hard-pressed to rely upon *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 521 (1st Cir. 1991). *Weinberger* involved class actions which were voluntarily discontinued because the defendant company increased the price per share of its stock. In discontinuing the class actions, the parties agreed that plaintiffs' counsel could seek attorneys' fees and entered into a "clear sailing" agreement. The First Circuit emphasized "the important nexus between judicial scrutiny and the avoidance of excessive or underserved fee awards in the class action environment." *Id.* at 524 (citing *Furtado v. Bishop*, 635 F.2d 915, 919 (1st Cir. 1980). In scrutinizing counsel's fee request, the Court stated that the equity principle allowing recovery on a POF basis "does not literally apply" where there is no true "common fund, and class action plaintiffs seek

attorney fees directly from the defendant…" *Id.* at 523. Thus, the Court held that even though the shareholder class members obtained monetary value from the increased price per share, there was no true "common fund," and the district court was correct in using the "lodestar method's proven usefulness as an understandable and manageable way of determining reasonable attorneys' fees in statutory cases…" *Id.* at 526.

## POINT III

## SHOULD THE COURT DECIDE THE FEE ISSUE WITHOUT AWAITING THE CLAIMS DATA, THEN THE LODESTAR METHOD SHOULD BE USED TO CALCULATE FEES

The Supreme Court has recently held that "[t]he lodestar figure has, as its name suggests, become the guiding light in our fee shifting jurisprudence," is "objective," and "permits meaningful judicial review, and produces reasonably predictable results." *Perdue v. Kenny*, 130 S. Ct. 1662, 1672 (2010), citing *City of Burlington v. Dague, 505 U.S. 557 (1992)* and *Hensley v. Eckerhart*, 461 U.S. 424 (1983).

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services." *Hensley v. Eckerhart,* 461 U.S. at 433 (1983). *See also, Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 296 (1st Cir. 2001).

In implementing the lodestar approach, the district court calculates the time counsel spent on the case, subtracts duplicative, unproductive or excessive hours, and then applies the reasonable prevailing rate in the community (taking into account the qualifications, experience, and specialized competence of the attorneys involved):

> If an alternative method is not expressly dictated by applicable law, we have customarily found it best to calculate fees by means of the time-and-rate method known as the lodestar...Given the lodestar method's proven usefulness as an understandable and manageable way of determining reasonable attorneys' fees in statutory cases, we find no reason why district courts should be divested of authority to employ it in analyzing fee applications submitted for approval in connection with class action settlements under Rule 23(e).

*Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 526 (1st Cir. 1991)(citations omitted).

This Circuit has long held that "[u]nless an alternative method is required by law, it is best to calculate attorneys' fees based on the number of hours reasonably expended multiplied by a reasonable hourly rate." *Frazier v. Commissioner, Maine Dep't of Health & Human Servs.,* 1994 U.S. App. LEXIS 7231 *3 (1st Cir. 1994). The single most important consideration is whether the fee request is reasonable. *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 830 (D. Mass. 1987), *following Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546 (1986).

The First Circuit has observed that the POF method can result in inflated and undeserved fees. "The goal of avoiding awards of undeserved fees is, we think, better advanced by close and systematic scrutiny than by special formulae such as [a percentage recovery rule] whose application at best involves highly subjective judgments and at worst permits radically disparate fee awards." *Furtado v. Bishop*, 635 F.2d 915, 919 (1st Cir. 1980). Thus, the First Circuit recognized that "while broad discretion and subjective views will necessarily weigh significantly in fee scrutiny, perhaps the most hopeful approach to date" is the lodestar. *Id.* at 919.

Significantly, although lodestar is required in statutory fee-shifting cases, the First Circuit has held that district courts have the discretion to use the lodestar method even in "common fund" cases. *In re Thirteen Appeals,* 56 F.3d 295, 308 (1st Cir. 1995). *See also United States v. 8.0 Acres of Land*, 197 F.3d 24 (1st Cir. 1999).

**A. The Lodestar Method Promotes Fairness, Accuracy and Avoids <u>the Risk of A Windfall to Attorneys Under the POF</u>**

In contrast to the problems inherent in the application of a POF method, the lodestar method has numerous benefits herein including: (a) avoidance of arbitrary or speculative valuation of the settlement, (b) providing meaningful review of the work done by plaintiffs' counsel based on legitimate hours and reasonable rates, and (c) avoiding the necessity for a valuation mini-trial and a "battle of the experts" on the peripheral issue of attorney fees. To be sure, Courts have evaluated attorney fee requests under the axiom that "a request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); *In re San Juan Dupont Plaza Hotel Fire Litig.*, 768 F. Supp. 912, 923 (D.P.R. 1991).

While precise settlement valuation is central to the use of a POF analysis, where a precise valuation is difficult or impossible, the lodestar method is preferred. *In re GM Pick Up Truck Fuel Tank Product Liab. Lit.,* 55 F.3d 768, 821 (3d Cir. 1995) ("[t]he lodestar rationale has appeal where, as here, the nature of the settlement evades the precise evaluation needed for the percentage of recovery method"). In *GM*, the settlement offered coupons for future vehicle purchases combined with a "clear sailing" agreement for the plaintiffs' attorneys to recover up to $9.5 million in fees from the defendants. Even in the absence of a dispute, the Third Circuit expressed serious concerns over how the settlement valuation was performed. The Court held:

> "Given our skepticism of the settlement's value generally and of [the expert's] estimates in particular...we are much less sanguine that the $9,500,000 fee actually constitutes an acceptable percentage of recovery."
>
> * * *
>
> "At the very least, the district court on remand needs to make some reasonable assessment of the settlement's value and determine the precise percentage represented by the attorney's fees."

We respectfully submit that use of the lodestar method eliminates the concerns expressed by the Court in *GM.*

## POINT IV

## PLAINTIFFS' EXPERT'S MISAPPLICATION OF DATA, RELIANCE ON UNSUPPORTED ASSUMPTIONS AND IMPROPER METHODOLOGIES RESULT IN GROSS INFLATION OF PAST DENIAL RATES AND ERRONEOUSLY INCREASE HIS VALUATION TENFOLD.

As outlined in the Report of Professor Janus Ordover, Mr. Kleckner's entire report derives its estimates from assumptions concerning "denial rates"—how many past claims for oil sludge repairs were denied by defendants. Mr. Kleckner's denial rate assumptions, however, rest on his misapplication of Exhibits 56.1 and 56.2, two VWoA Customer Care documents produced by defendants. These documents show a picture of the Volkswagen "Customer Care" denial rates regarding the August 2004 extended warranty claims that were presented to Customer Care from August 2004 through the start of April 2005 as compared to figures from April 2005 through January 2006. These exhibits do not contain any information concerning the broader universe of claims or the "denial rates" that came in at the dealership level. These documents do not show claims that were granted or denied at the dealer level, and calculate denials from a subset of the universe of claims. Mr. Kleckner's use of highly inflated denial rates as the predicate for

all his calculations results in a grossly inflated valuation for each element of the settlement.

In three paragraphs of his Report, Prof. Ordover clearly explains the fundamental error that underlies virtually all of Mr. Kleckner's overestimates and demonstrates the profound effect which it has on the prediction of reimbursement claims due by June 27, 2011:

> 8. To obtain an estimate of the denial rate, Mr. Kleckner improperly relies on two documents (Exhibits 56.1 and 56.2), which provide estimated denial rates for a subset of customers who applied to Volkswagen Customer Care in the August 2004 – January 2006 period. He wrongly assumes that the data in Exhibits 56.1 and 56.2 are a random sample of all customers requiring oil sludge-related repairs, whereas these denial rates reflect only inquiries at the Volkswagen Customer Care from customers whose reimbursements were not approved at the dealer. This major misinterpretation of the data causes Mr. Kleckner to adopt inflated estimates of the denial rates ranging from 68.2% to 86.7% for the population as a whole. [footnote] As I show below in Section IV, Mr. Kleckner's estimated denial rates lead to estimated failure rates that substantially exceed 100% within the first 8 years of life for some models and model years – a red flag that Mr. Kleckner's estimates are seriously flawed and overstated.
>
> 9. As I explain in more detail in Section IV, more reasonable and accurate estimates of the denial rates using the information in Exhibits 56.1 and 56.2 and the Warranty data ranges from 6.9% to 17.4%. These estimates are based on information indicating that a substantial percentage of Volkswagen customers whose claims were denied at the dealer appealed those denials to Volkswagen Customer Care so that the denial rates used by Mr. Kleckner reflect the denials of claims of those customers whose claims were denied once already. It is not surprising, therefore, that these denial rates are high but still not 100%.
>
> 10. To gauge the effect of the different estimates of the denial rates, start with the average denial rate of 74.1% (the average of Mr. Kleckner's estimates). Given that the observed value of claims in the Warranty data is A = $119 million, then the formula above yields estimated value of denied claims of N = $341 million. Alternatively, if the average denial rate is

> 11.2% (the average of my corrected estimates), then the same procedure translates into an estimate of the value of denied claims of N=$15 million, a huge difference. [footnotes omitted] See Exhibit 1 to Chase Declaration.

Prof. Ordover's complete Report details additional fatal errors, unsupported assumptions, or biased and unfounded conclusions which pervade Mr. Kleckner's report. For example, Mr. Kleckner attempted to attribute 25% of the cost of a standard power train service contract available in the market to "oil sludge." This was done without any study and based on allegedly speaking to people in the "industry." Chase Declaration, Exh. "2," Kleckner Dep. at p. 113-115. Remarkably, he had not reviewed two service contracts which were produced in this case before his deposition and available for purchase by owners of class vehicles. These service contracts exclude coverage for oil sludge. Chase Declaration, Exh. "3" and "4." Nor did Mr. Kleckner know whether a similar oil sludge exclusion was contained in the service contracts his colleagues reviewed for his analysis. Chase Declaration, Exh. "2," Kleckner Dep. at 98-99. In fact, oil sludge and oil contamination are routinely excluded from coverage in such contracts. See Chase Declaration, Exh. "5," exemplar service contracts.

Another erroneous assumption by Mr. Kleckner is that defendants' August 2004 extended warranty campaign has no informational or educational value. Chase Declaration, Exh. "2," Kleckner Dep. at p. 118. This assumption is completely refuted by Dr. Alan Dorris, a communication expert who analyzed the August 2004 Extended Warranty literature. Chase Declaration, Exh. "6," Report of Dr. Alan Dorris.

Each component of Mr. Kleckner's valuation also requires an estimate of the settlement take up rate – the rate at which car owners will file claims. Mr. Kleckner provides no empirical support for his arbitrary estimates of the take up rate for various

features of the Settlement. As explained by Prof. Ordover at Section VI of his Report, Mr. Kleckner's use of these arbitrary rates generates unreliable estimates of the settlement value. Chase Declaration, Exh. "1."

In Prof. Ordover's Report at Table 9, he summarizes the assumed take up rate for each component. For example, Mr. Kleckner assumes an 80% take up rate for the 8-year extended warranty claims and a 75% take up rate for year 9 and a 71.5% rate for year 10 under the 10-year extended warranty. Another example of Mr. Kleckner's assumption is that "take up" rates on the informational value of the Settlement start at 70% and then decline by 3.5 percentage points each year. There are two primary problems with Mr. Kleckner's approach: (a) the take up rates are high relative to the other settlements, and (b) there is absolutely no empirical basis for these adjustments. By providing arbitrary take up rates under the appearance of precision, Mr. Kleckner is able to manipulate any number for the estimated valuation, which leads to arbitrary and therefore unreliable estimates of each component of the valuation.

Defendants submit that Prof. Ordover's valuation of the settlement, which is the product of rigorous analysis of all relevant data and reliable methodology, is most accurate and should prevail. Mr. Kleckner's fundamentally misconceived approach to the same data, which largely rests on a failure to examine relevant information and improper methodology and assumptions, should not be accepted.

## POINT V

## THE COST OF CLAIMS ADMINISTRATION, AND THE AMOUNT OF ATTORNEYS' FEES AND EXPENSES REQUESTED BY PLAINTIFFS' COUNSEL, CANNOT BE INCLUDED IN THE VALUE OF THE SETTLEMENT

Mr. Kleckner further overstates the valuation of the settlement by improperly including (a) his estimated "claim administration" cost of $6,000,575, and (b) the $39,250,000 amount of attorneys' fees and expenses requested by class counsel. While neither of these figures bears validity, regardless of what methodology is used, these items cannot be included in the "value" of a settlement against which counsel's request for attorneys' fees and expenses is evaluated.

In *First State Orthopedics v. Concentra, Inc.*, 534 F. Supp.2d 500 (E.D. Pa. 2007), the Court, even in a true class action "common fund" settlement, refused to consider the requested amount of attorneys' fees and expenses as part of the fund from which those fees/expenses were sought to be measured. The Court stated:

> Plaintiffs' counsel suggests the requested figure is actually only 10.5 percent of the recovery, but this calculation assumes the recovery fund includes the attorneys' fees and expenses of $425,000 plus $15,000 for expenses set forth in the Settlement Agreement. <u>There is an element of double-dipping if attorneys' fees and expenses are included in calculating the settlement value for purposes of determining and reducing the percentage award; this approach will not be used</u>.

534 F.Supp.2d at 524, n.26 (emphasis added).

In *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp.2d 561, 575 (E.D. Pa. 2001), the Court held that plaintiff had overstated the value of a class action settlement by, *inter alia*, including the alleged cost of claims administration and the

amount of attorneys' fees and expenses requested by plaintiff's counsel. The Court stated:

> Finally, in estimating the value of the settlement at $28.5 million dollars, the parties also included (1) the costs of notice and administration ($2.3 million) and (2) attorneys' fees and expenses ($3.7 million). This $7 million in administrative expenses will not, of course, result in a direct benefit to the class. Under these circumstances, the court finds that the financial value the class members will receive for the settlement is $7.5 million, which is the amount that the defendants have committed to distribute to the class in cash.

157 F. Supp.2d at 575.

Accordingly, the true value of this settlement cannot include the cost of claims administration or the amount of attorneys' fees requested by class counsel.

## POINT VI

## PLAINTIFFS' COUNSELS' FEE RECORDS DEMONSTRATE SUBSTANTIAL WASTE, REDUNDANCY, EXTRAVAGANT AND EXCESSIVE DISBURSEMENTS, AND A CLEAR LACK OF "BILLING JUDGMENT" CALLING FOR A SUBSTANTIAL REDUCTION IN THE LODESTAR

Attorneys' fees must be reasonable. "This Court's role as the guarantor of fairness obligates it not to accept uncritically what lawyers self-servingly suggest is reasonable compensation for their services." *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991). Counsels' obligations before even submitting their fee request are no less significant. As directed by the Supreme Court:

> Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting.

> It is no less important here. Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." *Copeland v. Marshall*, 205 U. S. App. D. C. 390, 401, 641 F.2d 880, 891 (1980) (en banc) (emphasis in original).

*Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).

"In this regard, the Court must determine whether Plaintiffs' counsel "exercised 'billing judgment' in submitting the fee application." *Weinberger v. Great N. Nekoosa Corp.*, 801 F. Supp. 804, 815 (D. Me. 1992). In this case, it is apparent from the numerous examples -- a fraction of which are discussed below -- that plaintiffs' counsel did not exercise "billing judgment" in reviewing the time records and deducting the time that was a excessive, redundant, unnecessary and/or otherwise improper. Nor did counsel remove the extravagant expenses that could not legitimately be billed to a client. Instead, counsels' time records are permeated with innumerable examples of obvious duplication, inappropriate staffing and excess. In addition, except for two non-lead firms, plaintiffs' counsel have made no attempt to separate the "hard" hours from the "soft," or "core" from "non-core" hours in their fee application and therefore, the billed time is unduly excessive.[9]

In this Circuit, a court reviewing a fee petition under the lodestar method is not required to wade through every billed hour, claimed service, and charged expense, effectively conducting an audit of a plaintiffs' fee petition and then issue a telephone

[9] Two non-lead counsel, Jackson & Tucker P.C. and Vaughan Law Group, reduced their rate by several hundred dollars per hour to reflect "non-core" work. See, e.g., rate for Michael Allsup reduced from $400 to $140.00 per hour and again, to $115 per hour, for "reading and/or reviewing documents, correspondence, etc. filed and disseminated during litigation of the class."

book of minute findings. *Foley v. Lowell*, 948 F.2d 10, 20 (1st Cir. 1991) (affirming blanket 33% reduction of plaintiffs' counsel's lodestar from approximately.

Courts throughout the federal system, particularly when facing voluminous fee requests, address across the board categories of overcharge or deficient billing judgment with across the board adjustments. *See, e.g., Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 948-49 (9th Cir. 2007) (approving 20 percent across-the-board reduction on attorney's fee award because of firm's practice of billing in quarter-hour increments); *Loranger v. Stierheim*, 10 F.3d 776, 783 (11th Cir. 1994) (approving of across-the-board reduction for voluminous fee applications).

For example, in *Diffenderfer v. Gomez-Colon, supra,* the District of Puerto Rico effectively excised various categories of systemic inflation from an improperly bloated petition through an across the board reduction:

> The fifty items we deemed menial and dramatically over-billed were simply examples of the way in which Plaintiffs' counsel's practice of billing tended to inflate each entry. Because the fee application is lengthy, we imposed an across-the-board reduction rather than engaging in an hour-by-hour review to determine which items other than the fifty cited were likely inflated by the quarter-hour billing system … our decision to impose an across-the-board reduction of twenty percent was therefore reasonable.

606 F. Supp.2d at 230-231.

Another frequent target of across the board reduction or disallowance is excessive co-counsel conferences. *Weinberger supra,* 801 F. Supp. at 819 (disallowing 80% of time for co-counsel conferences), *citing In re Olson*, 884 F.2d 1415, 1429 (D.C. 1989) (reducing fee award because of excessive hours spent conferencing); *Yankee Candle Co. v. Bridgewater Candle Co., LLC*, 140 F. Supp.2d 111, 125 (D. Mass. 2001)

(communication with co-counsel in multiple-attorney defense passed the excessive mark). As the District of Maine put it in *Weinberger v. Great Northern Nekoosa, supra*:

> Although dozens of lawyers from 16 firms may have thought it necessary to review every piece of paper that crossed their desks during this takeover, that does not mean that it is reasonable to compensate each of them for these activities.

801 F. Supp. at 819 (citations omitted.)

The assignment of overqualified top billing attorneys to menial tasks is also the frequent occasion for appropriate adjustment. *See, e.g., Boston & Me. Corp. v. Moore*, 776 F.2d 2, 9 (1st Cir. 1985) (noting that courts may reduce fees for inefficient use of law partners); *Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic*, 2010 U.S. Dist. LEXIS 25241, *17-18 (D.P.R. 2010) (across-the-board 10% reduction to account for inefficient tasks by higher billing partners that could have been assigned to associates); *Bridgeport Music, Inc. v. Rhyme Syndicate Music,* 376 F.3d 615, 627 (6th Cir. 2004) (district court applied across-the-board reduction for 'top-heavy' billing).

The foregoing excesses, and more, permeate plaintiffs' counsel's time and expense records, calling for an appropriate, indeed significant, downward adjustment in the lodestar. Representative samples include:

1. Mr. Tresemer of the Irwin & Bossen firm billed 36 hours in a single day on 8/29/09, 30 hours on 3/4/08 and 24 hours on 9/4/09.

2. The Berger and Montague firm's "MAR" (presumably paralegal Maryanne Rossi, billing at $240 per hour) spent approximately 200 hours preparing time sheets and working on time and expenses between 2008 and 2010. This approximate $50,000 charge cannot appropriately be charged to defendants.

3. Irwin & Bossen attorney Darren Natvig, at $350 per hour, performed hundreds of hours of work (often straight billing of 8 or more hours a day) on work more appropriate for a paralegal, including entering VW discovery documents into an Excel Master Spreadsheet and "reclassifying them" into another computer program -- "Summation." For example in an entry for 12/18/07, he billed 2 hours to "Tested Systran system using ReadIris to convert TIFs to PDFs with German OCR, then translating with Systran; compared results with Sixberry's translations and my translations." He then billed another 5 hours getting the system operational and starting to enter the data into the Master Spreadsheet. He billed for clerical tasks like "print translations" and "make color copies" and assemble "binders" on 12/19/07 -- none of which any paying client would pay $350 to their lawyer. 7/10/08 shows him doing a review, translation and sort for scanning for 5.5 hours (at $1,925). On 6/23/09, he spent 4 hours "hooking up" Mr. Tresemer's laptop. The unreasonable nature of the $350 dollar per hour rate does not stop there, for Mr. Natvig also billed 56 hours for Rosetta Stone German Language training between 6/22/09 and 8/18/09. He also spent 3 hours (at $1,050) on 9/17/09 making hotel reservations and driver reservations. He also billed 8 hours for a public tour of the VW plant in Germany, completely unrelated to the litigation on 8/18/09.

4. Mr. Tresemer's bill contains significant time ($15,537) and expense ($3,461) for a trip from Denver to Newark, New Jersey to do reconnaissance on defendants' counsel's fee arguments at the *Dewey* fairness hearing. It goes without saying that Mr. Tresemer could simply have obtained the transcript of that hearing. In fact, he did obtain the transcript, and Mr. Natvig of this firm also billed for reviewing it, for 4 hours at $1,400.

5. Mr. McNulty's associate Brett Rosenthal spent 57 hours researching and writing a memo on attorneys' fees between 10/26/09 and 11/24/09 at a billing cost of $350 per hours equaling $19,950.

6. Inadequate billing judgment permeates all the firms' billings as reflected by such things as paralegals, (Roxanne Torrez at Irwin Boesen) billing at $75, to "update time records" or "scan records," tasks that are routinely performed by non-billing personnel.

7. Huge amounts of block billing permeate Mr. Tresemer's billing records, which are replete with time entries ranging from 5 to 30 hours in a given day for vague non-specified work including, on many different occasions, billing for an entire month's work of e-mails and letters in one day. Moreover, approximately 929 hours were block billed as "e-mails and letters." Many of the billing entries are not contemporaneous with the tasks billed. In addition, large blocks of time were billed, at his senior partner $550 per hour rate, for clerical tasks such as loading and categorizing documents in "Summation."

8. "Review" of the same document over and over again, in the name of "analyzing" or "studying" by multiple attorneys and quadruple billing for inter-firm conferencing is also not appropriate billing judgment. Failing to take into consideration "core" versus "non-core" work also reflected a lack of billing judgment. Plaintiffs' counsel had an obligation to coordinate their efforts in this matter, and not to replicate work. The records are replete with evidence that they did not do so.

9. A review of the time records conservatively shows that lead and non-lead counsel spent in excess of $600,000 for work related to preparing complaints. In view of the fact there was a sharing of work product, including the filing of similar complaints, this time is grossly excessive.

In considering attorney fees, "only those who confer an independent benefit upon the class will merit compensation." *In re Cendant Corp.* Sec. Litig., 404 F.3d 173, 191 (3d Cir. 2005). "[S]imply doing work on behalf of the class does not create a right to compensation; the focus is on whether that work provided a benefit to the class." *Id.* at 191. "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). To be sure, multiple repetitive time spent by numerous attorneys and billing personnel for the same or similar tasks does not "confer an independent benefit upon the class."

In addition, the billing by multiple of law firms does not show that their contributions to the case were "a substantial or material factor" in the outcome of the settlement, or justify every one of them billing to review the same document. *See, e.g., Weinberger v. Great Northern Nekoosa Corp.*, *supra*, (cutting lodestar where work billed was not "substantial or material").

The Court should subtract hours that are duplicative, unproductive or excessive. *Bogan v. City of Boston*, 489 F.3d 417, 426 (1st Cir. 2007). The time should not be compensated where plaintiffs' counsel has not engaged in billing review to eliminate the overlap in hundreds of hours of reviewing the same documents, attending co-plaintiff

meetings, e-mailing and talking on the phone between co-plaintiffs -- essentially performing the same work. As a general matter, "the time for two or three lawyers in a courtroom or conference, when one would do, 'may obviously be discounted.'" *Lipsett v. Blanco*, 975 F.2d 934, 938 (1st Cir. 1992).

Fee-shifting statutes are designed to "ensure effective access to the judicial process," *Hensley*, 461 U.S. at 429, not to serve as full employment or continuing education programs for lawyers and paralegals. *Lipsett*, 975 F.2d at 938. A trial court should review a claim that several lawyers were required to perform a single set of tasks with appropriate skepticism. *Id.; citing United Nuclear Corp. v. Cannon*, 564 F. Supp. 581, 590 (D.R.I. 1983) (district courts "must zealously guard against any propensity to over-staff litigation").

Here, plaintiffs' counsel did not certify that an effort was made to eliminate double or triple billing within their own law firms, let alone coordinating and appropriately dividing up the work and billing by multiple other firms. Duplication of time and billing is evident at every stage of the litigation. As noted, it appears all of the firms, and numerous personnel, billed for the drafting and review of various complaints totaling in the hundreds of hours, although the factual and legal allegations in these actions were essentially identical. A review of the various counsels' billing records shows multiple iterations of the same thing -- recycled over and over by high-billing personnel with only minimal alteration.

Duplicate billing occurred in numerous co-plaintiff meetings involving substantial travel, food and lodging throughout the country including Las Vegas, San Francisco,

Denver and Philadelphia. Many of these meetings involved three to five attorneys and staff, often multiple attorneys from the same law firm. For example, Mr. Tresmer's records show he billed approximately 233 hours on these meetings, most of which were attended by at least four (4) other lawyers for a total of 932 billable hours. A 5/16/07 trip to Las Vegas included five (5) attorneys. There were over half a dozen trips to Philadelphia. These meetings involved multiple attorneys, significant travel time and expense, and duplicative billings at very high hourly rates. The hourly fees do not even take into account expenses such as a restaurant bill during the Las Vegas trip on 5/16/07 totaling $875.70 for 5 people (approximately $175 per person).

When considering the number of attending attorneys, costs and expenses billed, at least $1 million dollars can be attributed to just these co-plaintiff counsel meetings. Such duplication is prohibited by Courts even where the time is spent in Court. *Lipsett v. Blanco*, 975 F.2d at 938 (the "'time of two or three lawyers in a courtroom or conference, when one would do, 'may obviously be discounted'"); *United Nuclear Corp. v. Connon, 564 F. Supp. 581, 590 (D. R.I. 1983)* ("trial court should ordinarily greet a claim that several lawyers were required to perform a single set of tasks with healthy skepticism").

A review of plaintiffs' counsels' time records shows that duplicative inter-firm meetings and communications between the various plaintiff counsel are estimated at 20 to 25% of the billings.

### A. If the Court Permits Recovery of Certain Non "Core" Work, Such As Phone Calls and E-Mails, They Should Be Billed At Much Lower Rates

In addition to cutting excessive time duplication and unnecessary work, Courts apply a distinction between "core" work, such as legal research and Court appearances,

and "non-core" work such as telephone calls and e-mails. *See Ciulla v Rigny,* 89 F. Supp. 2d 97, 104-05 (D. Mass. 2000); *Tuli v. Brigham & Women's Hosp., Inc.*, 2009 U.S. Dist. LEXIS 129768 (D. Mass. June 8, 2009). The billing records of the various plaintiffs' attorneys are replete with duplication on phone calls and e-mails between plaintiffs' counsel which result in hundreds upon hundreds of hours of unnecessary billing at maximum rates.

As examples, the Berger and Montague firm alone billed over 620 hours on telephone conferences, much of which were inter-plaintiffs' firm communications at an average $500 per hour, which would total $310,000. The Fox Rothschild firm, which is not a lead counsel, spent 62 hours on some type of "conferencing" and another 166 hours on some type of "reviewing." Mr. McNulty's billing records include 500 hours spent on telephone calls ($400,000) and another 106 hours for emails ($84,800), much of which appears to be between plaintiffs' counsel. Clearly, a conservative estimate shows e-mails and telephone calls just between plaintiffs' co-counsel accounts for millions of dollars in plaintiffs' billing records. And these inordinate fees are in addition to the significant fees for traveling throughout the country and meeting amongst themselves.

## POINT VII

## COUNSELS' HOURLY RATES ARE NOT PROPERLY SUPPORTED AND ARE EXCESSIVE

Plaintiffs' counsels' declarations do not attest that the rates of up to $800.00 per hour for partners and $240.00 for paralegals were the "ordinary billing rates for such attorneys in effect during that time," as required by this Court's November 12, 2010 Order. Counsel do not even state that that these rates are their "usual and customary"

rates, or that other firm clients actually pay these hourly rates to them -- two important indicia of fairness. Counsel, instead, make the vague, conclusory statement that "the hourly rates are consistent with those charged for these types of cases." This does not comport with the Court's November 12, 2010 Order requiring that counsel certify that the rates they charge were their "ordinary billing rates." [10]

A Court should look to "the prevailing market rates in the relevant community" in determining the applicable hourly rate. *Blum v. Stenson*, 465 U.S. 886, 895 (1984). Courts have interpreted the term relevant community to be the forum where the case is pending. *United States v. One Star Class Sloop Sailboat,* 546 F.3d 26, 40 (1st Cir. 2008); *Lipsett v. Blanco*, 975 F.2d 934, 937 (1st Cir. 1992).[11]

Plaintiffs' counsel fail to inform the Court of the comparables rates in this or any other venue, and simply give rates of $800 per hour for Mr. McNulty, $600 per hour for Mr. Henkin and $550 per hour for Mr. Tresemer. Their partners are at similarly high numbers, *e.g.* Mr. Henkin's partners Flaherty, Millstein and Carson who appear to bill respectively at $440, $385 and $490 per hour. Even the main paralegal at Berger and Montague, Ms. Rossi, was billed at $240 per hour. These rates are excessive, and should be reduced accordingly.

[10] Many of the non-lead plaintiffs' attorneys have also failed to comply with the Order. They merely state their rates were "usual and customary" as to similar class actions, but do not state that these are their ordinary billing rates. *See, e.g.*, Declarations of attorneys Chorowsky, Saunders, Sobran, Tucker, Vaughn and Weston. Some of plaintiffs' attorneys, like Mr. Waller, say nothing other than their rates are "reasonable."

[11] Plaintiffs' counsel have argued for the application of First Circuit law (See Fee Brief at p. 6).

## POINT VIII

## THERE ARE NO GROUNDS FOR LODESTAR ENHANCEMENT

The burden of proving that an enhancement is warranted is on the fee applicant. *Perdue v. Kenny A.*, __ U.S. ___, 130 S. Ct. 1662, 1673 (2010); *Blum*, 465 U.S. at 898.

Under binding Supreme Court precedent, lodestar enhancements or multipliers in fee-shifting cases are extremely rare, because many considerations that could lead to enhancement are contained within the lodestar itself. *See Penn. v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 566 (1986) ("The lodestar figure includes most, if not all, of the relevant factors constituting a reasonable' attorneys' fee").

The Supreme Court has effectively foreclosed enhancements in federal fee shift cases, ruling that "enhancement for contingency [under fee-shifting statutes] is not permitted." *City of Burlington ("Dague",* 505 U.S. 557 (1992).

The First Circuit is emphatic in rejecting multipliers to enhance the lodestar. *See Lipsett v. Blanco*, 975 F.2d 934, 942 (1st Cir. 1992) (enhancement for quality of representation is a tiny exception that may not "eclipse the rule," and is only available "where a combination of sterling performance and exceptional results could conceivably justify a premium fee"); *Adams v. Zimmerman*, 73 F.3d 1164, 1178 (1st Cir. 1996) (holding for second time post-*Dague* that contingency enhancement unavailable).

The lodestar figure is strongly presumed to be the reasonable attorney fee that the defendant should pay in a fee-shifting case. In fact, Courts in the First Circuit have concluded that the *Dague* prohibitions to a lodestar enhancement apply equally to common fund and fee-shifting cases. *Nensel v. Peoples Heritage Fin. Group, Inc.*, 815 F.

Supp. 26 (D.Me. 1993). *See also In re Nineteen Appeals,* 982 F.2d 603, 619 (1st Cir. 1992). In *Nineteen Appeals*, Judge Lay, concurring with the majority, wrote that the Supreme Court's *Dague,* prohibition against lodestar enhancers in a fee shift case would operate to bar a lodestar enhancer in a percentage context since the reasoning behind the prohibition-- that a factor in the attorney's risk in taking a contingency case -- the difficulty of establishing the merits -- is already included in the lodestar calculation. Thus, said Judge Lay, "to again take this factor into account in the form of a lodestar enhancement would amount to "double-counting."

A rare, extraordinary lodestar enhancement is not justified by virture of complexity or risk in this case. Plaintiffs' counsel utilized *O'Keefe v. Mercedes,* 214 F.R.D. 266 (E.D. Pa. 2003), a similar oil sludge case, as a model for this action including consulting with the same expert. In addition, despite being a class action, this case was not extraordinarily complex. While counsels' Declarations emphasize that depositions were taken pursuant to the Hague convention in Germany, international depositions frequently take place in commercial cases in a global economy. There is nothing unique about taking depositions abroad that would justify an enhancement. Similarly, counsel's assertion that documents were in a foreign language and needed to be translated is embodied, albeit overinflated, in their lodestar, and does not exalt this action above the myriad of commercial disputes involving foreign defendants that are routinely adjudicated in this Court.

## POINT IX

## EVEN IF THE COURT WERE TO USE A POF METHOD, A TWENTY TO THIRTY PERCENT FEE WOULD NOT BE JUSTIFIED.

Plaintiffs' counsel incorrectly argue that courts "typically" recognize 20 to 30 percent fee awards in "similar" common fund cases. However, a review of the cases on counsels' Chart for "comparably sized common fund settlements," (*Fee Brief* at 17), shows that those cases were totally dissimilar and not applicable to the case herein. The cases referred to by plaintiffs involved massive securities, antitrust or racketeering cases. For example, *Tyco* involved the third largest securities class action ever, -- which was funded in cash. In addition, unlike the case at bar, these securities, antitrust and racketeering cases were true "fund cases" where valuation was not an issue and where class counsel were paid directly out of a monetary fund. *See, e.g., In re Relafen*, 231 F.R.D. 52 (D. Mass. 2005) ($75 million settlement pool); *In re Ikon Office Solutions Inc. Sec. Lit.*, 194 F.R.D. 166 (E.D. Pa. 2000) ($111 million pool); *In re Ratheon*, 2004 U.S. Dist. LEXIS 30985 (D. Mass. 2004).

With the exception of *O'Keefe v. Mercedes*, plaintiffs' counsels' chart ignores the many automotive product class actions where the percentages awarded were significantly smaller. *See, e.g., Dewey v. Volkswagen of America, Inc.*, 2010 U.S. Dist. LEXIS 79304 (D. N.J. 2010) (awarding 13.3% of $69,277,430 for a total of $9.2 million after cutting valuation from what plaintiffs' counsel originally "valued" at $142 million); *Hanlon v Chrysler*, 150 F. 3d 1011 (9th Cir. 1998) (in nationwide class action, with an agreed upon settlement value of $115 million, Court awarded attorneys' fee expenses of $5.2 million, or roughly 4.5%); *White v GMC*, 718 So.2d 480 (1st Cir. 1998) (in certified nationwide class action, with estimated minimum cash value at $583 million, Court awarded a $24

million attorneys' fee, or roughly 4.5%); *Smith v DaimlerChrysler*, 2005 U.S. Dist. LEXIS 25107 (D. N.J. 2005) (in settlement valued at $36.8 million to $52.8 million, Court awarded $7.5 million in attorneys' fees, or roughly 14.5%).

*O'Keefe,* which involved a fee award of 15%, is distinguishable. While *O'Keefe* involved a similar type of oil sludge settlement, it did not involve a pre-existing oil sludge warranty such as the 8 year/unlimited mile extended warranty which was voluntarily implemented by defendants here. The extended warranty provided in the *O'Keefe* settlement was a full extended warranty in the first instance, whereas the settlement herein involves a 2 year enhancement on the already existing 8 year/unlimited mile warranty which, plaintiffs' expert concedes, had a value of $120 million.

## CONCLUSION

For the reasons set forth above, defendants respectfully request 1) that the Court defer ruling on the attorney fee application until after the June 27, 2011 claims deadline has passed, 2) that the Court apply the lodestar method to determine attorney fees, and 3) in applying the lodestar method, the Court substantially reduce plaintiffs' claimed lodestar and deny any enhancement thereto.

January 24, 2011

VOLKSWAGEN GROUP OF AMERICA, INC.
VOLKSWAGEN AG
AUDI AG
by their Attorneys

*/s/ David A. Barry*

David A. Barry, BBO No. 031520
Andrew R. Levin, BBO No. 631338
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street, 9th Floor
Boston, MA 02114-4737

(617) 227-3030
barry@srbc.com

Jeffrey L. Chase, Esq. (*pro hac vice*)
Daniel V. Gsovski, Esq. (*pro hac vice*)
Michael B. Gallub, Esq. (*pro hac vice*)
Herzfeld & Rubin, P.C.
125 Broad Street
New York, NY 10004
(212) 471-8500
jchase@herzfeld-rubin.com
dgsovski@herzfeld-rubin.com
mgallub@herzfeld-rubin.com

Of Counsel:

Maureen Doerner Fogel, Esq.
Natalie Flores Campbell, Esq.

Dated: January 24, 2011